LAW OFFICE OF PETER C. HSIEH
PETER C. HSIEH     3204
hsiehp002@hawaii.rr.com
*- and -*
LAW OFFICE OF GEORGE A. BURKE
GEORGE A. BURKE     7821
gaburke@hawaii.rr.com
Davies Pacific Center
841 Bishop St., Ste. 2201
Honolulu, Hawaii  96813
Phone: (808) 521-3336

Attorneys for Plaintiffs
STEVEN A. HYER, Individually and
as Personal Representative of THE
ESTATE OF STEVEN K. HYER, and
CASSI H. HYER

*- and -*

LAW OFFICE OF MYLES S. BREINER
MYLES S. BREINER     4364
myles@breinerlaw.net
1003 Bishop Street, Suite 2150
Honolulu, Hawaii  96813
Telephone:  (808) 526-3426

Attorney for Plaintiffs
THERESA L. CHANG,
THOMAS FUJIMOTO, and
JAMES FUJIMOTO, JR.

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| STEVEN A. HYER, Individually and as Personal Representative of THE ESTATE OF STEVEN K. HYER, | CIVIL NO. _____<br><br>COMPLAINT; DEMAND FOR JURY |

CASSI H. HYER, THERESA L.
CHANG, THOMAS FUJIMOTO,
JAMES FUJIMOTO, JR.,

        Plaintiffs,

    vs.

CITY AND COUNTY OF
HONOLULU, HONOLULU POLICE
DEPARTMENT, SUSAN BALLARD,
Chief of Police of the Honolulu Police
Department, JOHN DOE 1, individually
and in his official capacity as Field
Supervisor, WAYNE SILVA,
individually and in his official capacity
as Police Officer K-9 Handler of the
Honolulu Police Department, JOHN
DOE 2, individually and in his official
capacity as Police Officer of the
Honolulu Police Department, JOHN
DOES 4-10, JANE DOES 1-10, DOE
CORPORATIONS 1-10, DOE
PARTNERSHIPS 1-10, DOE
UNINCORPORATED
ORGANIZATIONS 1-10,

        Defendants.

TRIAL; SUMMONS

## COMPLAINT

      Plaintiffs STEVEN A. HYER, Individually and as Personal

Representative of THE ESTATE OF STEVEN K. HYER, and CASSI H. HYER, by

and through their attorneys, Peter C. Hsieh and George A. Burke, and Plaintiffs

THERESA L. CHANG, THOMAS FUJIMOTO, and JAMES FUJIMOTO, JR., by

2

and through their attorney, Myles S. Breiner, for a Complaint against the above-named Defendants, allege and aver as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343 and 367 and pendant jurisdiction over state claims.

2.    Venue is proper pursuant to 28 U.S.C. §1391(b) because Plaintiffs' claims arose in this judicial district in the City and County of Honolulu, State of Hawaii.

3.    This action is brought pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. § 1983 ("§ 1983") and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq.

## PARTIES

4.    Plaintiff STEVEN A. HYER ("Hyer"), Individually and as Personal Representative of THE ESTATE OF STEVEN K. HYER ("Steven"), is, and was at all times relevant herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii, and Steven's father.

5.    Plaintiff CASSI H. HYER is, and was at all times relevant herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii, and was married to but physically separated from STEVEN.

6.    Plaintiff THERESA L. CHANG is, and was at all times relevant

3

herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii, and Steven's mother.

7.     Plaintiff THOMAS FUJIMOTO is, and was at all times relevant herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii.

8.     Plaintiff JAMES FUJIMOTO, JR., is, and was at all times relevant herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii.

9.     Defendant CITY AND COUNTY OF HONOLULU ("City") is, and was at all relevant times herein, the municipal corporation organized under the laws of the State of Hawaii and is, and was at all relevant times herein, liable for the acts and/or omissions of the Honolulu Police Department and its administrators, Chief of Police, police officers, administrators, and employees.

10.     Defendant HONOLULU POLICE DEPARTMENT ("HPD" or "the police") is, and was at all relevant times herein, the principal law enforcement agency of the City and County of Honolulu, Hawaii, headquartered in the Alapa`i Police Headquarters in Honolulu, State of Hawaii.

11.     Defendant SUSAN BALLARD ("Chief Ballard") is, and was, at all times relevant, the Chief of Police of the HPD and an agent, servant and employee of the City, acting under the color of state law with the permission and consent and

4

within the course and scope of said agency and employment at all times relevant to this lawsuit; was at all relevant times herein Police Chief responsible for, among other things, establishing, implementing, and enforcing HPD policies and procedures; and is being sued in her individual and official capacities.

12.     Defendant JOHN DOE 1 ("John Doe 1") was, at all times relevant, an officer with the HPD, and an agent, servant and employee of the City, acting under the color of state law with the permission and consent and within the course and scope of said agency and employment at all times relevant to this lawsuit; was at all relevant times herein the field supervisor or the officer with field supervisory authority at the time of the incident; and is being sued in his individual and official capacities.

13.     Defendant WAYNE SILVA ("Silva") was, at all times relevant, an officer with the HPD Specialized Services Division, and an agent, servant and employee of the City, acting under the color of state law with the permission and consent and within the course and scope of said agency and employment at all times relevant to this lawsuit; was at all relevant times herein the HPD K-9 handler who deployed the police dog which triggered the fatal shooting; and is being sued in his individual and official capacities.

14.     Defendant JOHN DOE 2 ("John Doe 2") was, at all times relevant, an officer with the HPD, and an agent, servant and employee of the City,

acting under the color of state law with the permission and consent and within the course and scope of said agency and employment at all times relevant to this lawsuit, was the officer who fatally shot Steven, using excessive and/or unreasonable deadly force; and is being sued in his individual and official capacities.

15.    JOHN DOES 4-10, JANE DOES 1-10, DOE CORPORATIONS 1-10, DOE PARTNERSHIPS 1-10, DOE UNINCORPORATED ORGANIZATIONS 1-10 are sued herein under fictitious names for the reason that their true names, capacities and responsibilities are presently unknown to Plaintiffs, but upon information and belief they are persons, entities, governmental agencies, and/or partnerships who were in some manner presently unknown to Plaintiffs engaged in the activities alleged herein; and/or are in some manner responsible for the injuries and damages to Plaintiffs; and/or are persons who conducted some activity in a negligent, wrongful, and/or willful manner or who failed to fulfill a duty or obligation, which action, conduct, error or omission was the proximate cause of injuries or damages to Plaintiffs; and/or were in some manner related to the previously named Defendants engaged in the activities alleged herein.  Plaintiffs will seek leave to amend this Complaint when the true names and capacities of the Doe Defendants have been ascertained.

6

## FACTUAL ALLEGATIONS

### Overview

16.    In the early morning hours of June 23, 2018, in the City and County of Honolulu, State of Hawaii, the police shot and killed Steven in his own home after he refused to come out. He was mentally ill and had been behaving strangely. A HPD police psychologist instructed the officers to take him to a psychiatric facility for evaluation and treatment. When STEVEN refused to come out, police officers brought in the SWAT Team instead of a crisis negotiator or police psychologist trained and experienced in handling these situations.

17.    During the seven-hour standoff, the officers tried to get him to come out telling him to come out peaceably. When that failed, they got on a bullhorn and taunted, insulted, and ridiculed him, loud enough for all the neighbors to hear, in an attempt to shame him into surrendering. When that failed, they shot rubber projectiles and tear gas at him, while simultaneously barking at him on the bullhorn to come out. And when that failed, they entered his home – without a warrant or any warning – by sending in a police dog after him. Then when he reacted defensively to the surprise dog attack, a police officer shot him three times killing him.

### Steven Lived By Himself in a Small Studio

18.    At the time of the incident, Steven was living by himself in a small rental studio in the back of a house near Sunset Beach located at 58-020 Kapuai

7

Place, Haleiwa, Hawaii 96712.

19.    The house sits in a residential area bordered by neighboring homes.

20.    The front of the house, which is the main part of the house, was occupied by other tenants.

21.    Steven's room was approximately 12 feet by 14 feet with a sliding glass door which led out to a wooden deck and a short flight of stairs down to the back yard.

22.    The only way in and out of his room was the glass sliding door.

23.    During the entire time of the incident, Steven was the only one in the room.

<u>Steven Was Mentally Ill</u>

24.    Steven was a 32-year-old disabled veteran.

25.    He served in the U.S. Air Force for a couple of years before he was discharged at age 23 with a medical disability due to a serious and severe head injury he sustained during his military service.

26.    The head injury rendered Steven mentally unstable, for which he received continuous and regular mental health treatment by doctors at the Veteran's Administration ("VA") up until he was killed on June 23, 2018.

<u>Police Knew Steven Was Mentally Ill</u>

27.    Approximately three months prior to the shooting, around March or April of 2018, Steven was staying with his father, Hyer, and his wife at his Makakilo home.

28.    There were already signs of Steven's mental instability back then.

29.    He would do things like would jump up on top of the concrete wall surrounding Hyer's house and walk along the top of it to stand guard.

30.    One day Hyer woke up and smelled smoke in the house, and he saw that Steven had put something on the stove and had fallen asleep.

31.    Hyer yelled at Steven for not watching the stove and that it could have caused a fire and burned down the house.

32.    They got into a loud argument.

33.    Steven's sister, Lapriel Hyer ("Lapriel"), and her boyfriend were at the house, and she took their father's side telling Steven that he can't put something on the stove and then go to sleep.

34.    Steven became irate and turned his frustration on Lapriel and physically attacked her.

35.    Hyer and Lapriel's boyfriend jumped in and subdued him and called the police.

9

36.    After interviewing the people in the house, the police determined that Steven was suffering from a mental disturbance and transported him to Tripler Army Medical Center for psychiatric evaluation and treatment, pursuant to HPD Policy No. 4.22, section III ("MH-1").

37.    The police filed a police report documenting this incident.

38.    This report presumably was in the police data system on the night of the shooting and would have come up when the police ran his name.

First Call: Steven's Mental Disturbance Was Evident to the Police

39.    On June 22, 2018, the police were called twice to come to the house due to Steven's bizarre behavior.

40.    The first call to the police was made at approximately 6:00 p.m. in response to an argument involving tenants residing at the house.

41.    An argument arose between Doug Page ("Page"), one of the tenants living in the main part of the house, and Steven regarding an electric bill.

42.    Page went to talk to Steven about the electric bill being so high and that it was due to Steven's use of an air conditioning unit in his room.

43.    According to Page, Steven appeared agitated that day.

44.    Steven was usually pleasant but kept to himself.

45.    When confronted about the electric bill, Steven became defensive and argumentative.

10

46.     He insisted that he had the landlord's permission to run the AC.

47.     He became quite upset and damaged a window screen apparently in an attempt to gain entry into the room or area where Page was living.

48.     Page got scared and called the police to report that Steven had broken a window to try and into the house.

49.     Two police officers, Officer Steve Keogh ("Keogh") and an unidentified female officer, arrived in response to the call.

50.     They met with Page briefly, then walked to the rear of the house to Steven's room.

51.     Page decided to document the incident, so he followed them and stood out of sight behind the corner of the house and began videotaping the interaction between the officers and Steven.

52.     Keogh took the lead and started questioning Steven about what was going on.

53.     Steven then started talking about the FBI, CIA and devil worshippers, and he asked the officers to leave.

54.     Keogh told Steven that it was not that easy and that he [Steven] cannot damage another person's screen without consequence.

55.     Steven rambled on and on, and stated that he wanted to tell them that they have to leave.

11

56.    Then he started talking about the walls in the house having bodies in them and invited the officers to come in and look for them.

57.    Steven told them he could show them "exactly where they [the dead bodies] are,"

58.    Given what Steven was saying, Keogh became concerned and asked if he smoked meth, and Steven said no.

59.    Keogh asked Steven whether God would approve of him breaking into the home of another, and told him that his talking about Jesus Christ and dead bodies made him believe that he may be smoking ice.

60.    Steven got upset by Keogh's remarks and started arguing with him, and in the process admitted to Keogh that he was the one who broke the window screen at the front of the House, but said that it is their [the tenants living in the front of the House] fault for not listening to him.

61.    Steven then started talking about "the Illuminati."  This is a term that refers to the Bavarian Illuminati, an Enlightenment-era secret society founded in 1776 whose goals were to oppose superstition, obscurantism, religious influence over public life, and abuses of state power.

62.    Keogh informed Steven that he was at the house responding to a call because two other people in the house were scared that he might hurt himself and them.

12

63.    Steven stated that he was not going to hurt himself.

64.    The conversation continued with Steven making more references to bodies in walls, devil worshippers, and other seemingly bizarre topics.

65.    Towards the end of the encounter, Keogh and Steven see that Page is videotaping them.

66.    Steven immediately becomes agitated at Page and again called him devil worshipper.

67.    The officers decided to leave without taking any action against Steven.

68.    The officers' departure upset Page, and he stated, as they were leaving, that Steven knows he was the one who called the police on him and that he was at risk being left alone with him.

69.    Page's conversation with the officers was heard by another roommate named Keith.

70.    The officers informed Page that the reported incident "doesn't rise to the level of where we need to take him away" and that "from a police standpoint, not enough there."

71.    At that point, Steven came out and made the symbol of the Illuminati at the two men and the officers.

72.    Page told the officers that they would be coming back, and asked,

13

"How is this not enough?" and "I am supposed to sleep here?"

73.    Despite their protestations, the officers drove away.

The Police Should Have But Failed to Take Steven Into Custody

74.    Steven's admission that he broke the window screen and his bizarre and irrational behavior should have been sufficient probable cause for Keogh to arrest Steven for property damage and to call a police psychologist to initiate MH-1, pursuant to HPD Policy No. 4.22.

75.    HPD Policy No. 4.22, section III, provides that, for people who have committed nonfelony offenses, an officer should initiate the MH-1 process when the officer has probable cause to believe the person is imminently dangerous to self or others as a result of mental illness, emotional disturbance, or substance abuse, then the officer shall call for assistance from the department's Mental Health Emergency Worker ("MHEW")/police psychologist. If the department's MHEW/police psychologist determines that the person is imminently dangerous to self or others, the MHEW/police psychologist shall inform the officer to transport the person to a designated, licensed psychiatric facility.  The officer shall then ensure transport of the person by suitable means to the designated, licensed psychiatric facility.

76.    Pursuant to HPD Policy No. 4.22, Keogh should have initiated a MH-1 and called a MHEW/police psychologist because he had probable cause to

14

believe Steven was imminently dangerous to self or others as a result of mental illness, emotional disturbance, or substance abuse.

77.    If Keogh had done so and run a check on Steven's background, it would have revealed Steven's prior trip to Tripler a few months earlier for psychiatric evaluation, and the MHEW/police psychologist would have directed Keogh to transport Steven to a designated, licensed psychiatric facility for evaluation pursuant to MH-1.

78.    However, Keogh drove away without taking any action pursuant to HPD Policy No. 4.22, and missed a critical opportunity to take Steven into custody.

<u>Second Call: Police Instructed to "MH-1" Steven</u>

79.    "MH-1" refers to the police taking a person who is mentally ill or mentally unstable to a designated, licensed psychiatric facility at the direction of a MHEW or police psychologist, pursuant to HPD Policy No. 4.22.

80.    Two hours after the police left the house, they were called back a second time.

81.    At approximately 8:00 p.m., Page accidentally dropped a bottle on the wooden floor in his part of the house, making a loud sound, which appeared to have startled and angered Steven.

82.    He started yelling, walked to the front part of the house, and

15

climbed through the kitchen window and chased after Page.

83.    Page ran to his room and closed the door, and yelled to Keith to call the police.

84.    The same two officers, Keogh and the female officer, returned to the house.

85.    Page told them what had just happened, that Steven had gone berserk, broke into their side of the house through the kitchen window, and ran after him.

86.    Based on Page's statement, Keogh had probable cause to believe that Steven was imminently dangerous to himself or others as a result of mental illness, emotional disturbance, or substance abuse and should be taken to a designated, licensed psychiatric facility for evaluation and assessment, pursuant to HPD Policy No. 4.22.

87.    Keogh called the on-duty police psychologist and briefed him/her on the situation.

88.    The police psychologist instructed him to take Steven to a psychiatric facility for evaluation and treatment, pursuant to HPD Policy No. 4.22.

89.    As instructed, KEOGH initiated MH-1 and called dispatch and his supervisor of the MH-1, and asked for back-up.

16

<u>Police Failed to Follow HPD Protocol</u>

90.    For years HPD police officers repeatedly and continuously mistreated and/or mishandled the mentally ill or mentally unstable while attempting to take them into custody, which resulted in injury or death to the person who was mentally ill or mentally unstable.

91.    Numerous suits were brought against the City and HPD for their failure to handle the mentally ill in a proper manner.

92.    Hence, in or around 2006, the HPD established a protocol, setting forth a set of rules governing how the police are dealing with the mentally ill, including, but not limited to, the following:

        a.    De-escalate the situation;

        b.    Remain calm and non-threatening;

        c.    Be helpful and patient;

        d.    Maintain adequate space between them and the subject;

        e.    Announce their actions before initiating them;

        f.    Move slowly;

        g.    Remove distractions, upsetting influences or disruptive people from the scene;

        h.    Not to stare as this may be interpreted as a threat;

        i.    Not to crowd or touch the subject; and

          j.     Not to express anger, impatience, or irritation.

93.    The police breached every rule in the HPD protocol that night.

Steven Was "Seized" by the Police

94.    Backup officers arrived at the house.

95.    A next door neighbor started to notice increasing police presence outside of Steven's room.

96.    He had overheard the conversation between Page and the police earlier in the evening.

97.    The police started questioning Page about the layout of the house and Steven's room.

98.    Page described the layout to them and told them that the sliding glass door was the only way in and out of Steven's room.

99.    The police were told that there were no one else in the house.

100.    The police checked the house to make sure that everyone in the house was evacuated, and they told onlookers in the neighborhood to leave the area.

101.    The police remained at the house for the next several hours.

102.    More officers arrived and surrounded Steven's room.

103.    At this point, Steven the target of the officers' conduct.

Police Escalates By Calling in the SWAT Team

104.    Instead of calling a crisis negotiator or police psychologist to

18

come to the house and assist in negotiating with Steven, the police called in the SWAT (special weapons and tactics) Team from the HPD Specialized Services Division to deal with the standoff.

105.   The SWAT Team is a law enforcement unit which uses specialized or military equipment and tactics, including submachine guns, assault rifles, riot shotguns, sniper rifles, riot guns, tear gas, smoke, and stun grenades.

106.   Calling in the SWAT Team for this situation was overkill, excessive, and unreasonable.

107.   The SWAT Team that responded to the call reportedly had been in training in the field all that day; thus, they were fatigued and not in the best frame of mind to handle this particular crisis.

108.   At approximately 11:00 p.m., the neighbor heard the police were back again after hearing loud talking going back and forth between Steven and the police.

109.   The neighbor went downstairs to listen to the exchange.

110.   He heard the police asking Steven to "talk story."

111.   He heard Steven telling them that he didn't want to "talk story."

112.   The whole scene seemed "surreal" and confounding according to the neighbor, especially after he heard the police taunting Steven, calling him a "DELINQUENT" and telling him to "COME OUT YOU COWARD."

19

113.    Smith saw that the police were not trying to calm the situation down as what they were saying to Steven "was not calming at all."

114.    After listening for approximately an hour to one-and-a-half hours, the neighbor went back to sleep upstairs.

115.    A short time later, he woke up to beams of flashlight shining on his second floor balcony and windows.

116.    He could hear the heavy sound of boots on his wooden balcony floor.

117.    He could see the police were trying try to get a better view of Steven's room from the balcony, which overlooked his room and back porch and yard.

118.    The police told him to "go back to sleep."

119.    He tries to but couldn't, not with all the commotion.

120.    Minutes later, he heard what sounded like "shots."

121.    He jumped out of bed, looked out the window, and saw a swarm of police officers and a SWAT Team heavily armed and shielded surrounding the perimeter of Steven's room.

122.    He described one of them as wearing military-type gear and a helmet and bulletproof vest, and holding a shield, and the other officer who was closest to the steps leading up to the Steven's porch was carrying what looked to him

to be a "machine gun."

123.   At around this time the neighbor also heard the sound of a chainsaw as the police started to cut down the tall hedges between Steven's backyard and the side road adjacent to the house.

124.   The presence and conduct of the police seemed to agitate Steven.

125.   The neighbor also heard someone mention either a "cross bow or bow and arrow."

Police Resort to Use of Force

126.   After another period of time, the neighbor began to sense that the situation was about to get worse.

127.   There was still no crisis negotiator or police psychologist at the scene.

128.   It was 2:30 in the morning.

129.   The police were using a bullhorn to talk to Steven.

130.   Steven was inside his room but not doing or saying anything to the police.

131.   The police told Steven to "come out of the house, hands up. Come out of the house with your hands . . . [sound of shot fired] . . . nobody is gonna get hurt if you just surrender."

132.   As one police officer was saying this to Steven, another officer

was simultaneously shooting tear gas and/or rubber projectiles at him through the sliding glass door.

133.   At no time did the officer tell Steven why they want him to come out or inform him what they would do if he refused to comply with their orders.

134.   The contradictory actions of the police confused and agitated Steven, putting him in a position where if he came out, he would be shot, but if he stayed put, they would continue to shoot at him.

135.   Steven was heard in the background yelling mostly unintelligible things, but at one point he was clearly heard saying "you are making fools out of yourselves in front of the whole world."

136.   Still no crisis negotiator or police psychologist was on hand to assist.

<u>Police Stormed Steven By Force</u>

137.   The police field supervisor at the scene failed to take control of the situation and de-escalate the crisis, which by this point was getting out of hand.

138.   Instead of calling for a crisis negotiator or police psychologist to mitigate the crisis, the police made things worse by resorting to hyper-aggressive tactics to force Steven out of his room and end the standoff.

139.   However, the situation did not warrant such drastic measures.

140.   What was needed was a trained and experienced crisis negotiator

22

who could calmly talk Steven into going to the hospital.

141.  Steven was surrounded by the police.

142.  He did not pose an immediate threat to the safety of the officers
or others.

143.  He was alone in his room.

144.  He did not attempt to flee.

145.  He was not actively resisting arrest.

146.  He made no attempts to hurt himself.

147.  The police could plainly see that Steven was not posing any
imminent risk of danger to himself, the police, or the community.

148.  The officers clearly were not forced make split-second
judgments, in a situation that was tense, uncertain, and rapidly evolving.

149.  But the police carried on with their aggressive tactics.

150.  In the middle of asking him to come out of the studio voluntarily,
saying, "we want this to end peacefully," one or more officers continue to shoot at
him with tear gas and rubber projectiles, sending mixed messages to Steven, further
confusing and enraging him.

151.  Still no crisis negotiator and/or police psychologist was on site.

152.  The situation had clearly gotten out of control.

153.  The police field supervisor should have taken control, de-

23

escalated the situation, stopped the shootings, ordered a stand-down, and waited for a crisis negotiator who was better suited to handle the standoff.

### The Police Sent in a Police Dog and Then Shot Steven Dead

154.   With no proper supervision by John Doe 1 (police supervisor) and/or any effective assistance from a crisis negotiator or police psychologist, the officers turned the situation deadly, in an attempt to end the standoff.

155.   They entirely disregarded the earlier instructions of the police psychologist to take Steven safely to a designated, licensed psychiatric facility for mental health assessment.

156.   At approximately 2:34 a.m., the next door neighbor saw that the situation was continuing to escalate and, in his mind, "something felt like it was going to happen."

157.   He hears commotion and loud talking.

158.   Steven was standing at the sliding door entrance of his room.

159.   He turned around and walked away from the sliding door back into his room.

160.   The police failed to warn Steven that if he refused to come out of his room voluntarily, they would send in a police dog and shoot him.

161.   Without any warning and without a search warrant, Silva, the HPD K-9 Handler, deployed his police dog, Zero, bolting into the room to take

24

Steven down.

162.   Steven was surprised by the sudden appearance of the dog and reacted defensively.

163.   The dog barked once, then John Doe 2 fired three rapid gunshots at Steven, killing him.

164.   The police claimed later that Steven had stabbed Zero before John Doe 2 shot him.

165.   If Steven had stabbed Zero, Silva would have been in close proximity to see it, but he saw no such thing.

166.   In fact, in a special investigative interview with Matt Levi, Silva acknowledged that they did not know Steven had stabbed Zero, stating, "We didn't know it at the time, but after the incident was over, I noticed blood all over me."

167.   At no time did John Doe 2 or any other officer warn Steven that he would be shot if he did not stop resisting the dog, as they are required to do before using deadly force.

168.   If the police had given the warning, Steven would not have lost his life.

169.   The police never gave him a chance to come out alive.

<u>Deployment of Police Dog Was Excessive and/or Unreasonable Use of Force</u>

170.   Silva's decision to deploy Zero violated the requirements under

25

HPD Policy 1.04, section VIII, subsection F (April 24, 2015), which states:

> The canine handler is responsible for knowing the policies, rules, and regulations regarding canine deployment. The handler has the training and experience to evaluate the responses and actions of his or her canine, its capabilities, and its limitation. The handler alone shall make the final decision to deploy the canine.

> The guidelines for deployment shall be based on the standard of reasonableness, weighing the safety of the public against the immediate need to apprehend.

171.   Steven's refusal to obey police orders to come out of his apartment constituted a low, passive level of resistance, pursuant to HPD Policy 1.04, section V.

172.   He was not a suspect of a serious criminal offense.

173.   He did not pose a serious threat to the safety of the officers or others.

174.   The police claimed that he stabbed the police dog after he was attacked by the dog; however, Silva's subsequent statement contradicts that claim.

175.   Even if the claim were true, it was not a justifiable reason to shoot and kill Steven.

176.   The police claimed after the shooting that Steven had a crossbow.

177.   However, assuming there was one, at no time was the crossbow cocked and loaded, nor did Steven point or shoot the crossbow, loaded or unloaded,

at any officer or other people.

178.   The police already had Steven contained and surrounded in his own room; hence, his actions did not pose a threat of serious physical harm either to the officers or to others, and there was no immediate need to apprehend or end the standoff violently.

179.   Time was on the side of the police; they could have waited Steven out; they could have turned the situation over to a crisis negotiator to reach a peaceful resolution with Steven.

<u>Shooting Steven Was Excessive and/or Unreasonable Use of Deadly Force</u>

180.   John Doe 3's decision to use deadly force by fatally shooting Steven is governed by HPD Policy No. 1.04, subsection IX, which states:

<u>DEADLY FORCE AND FIREARMS</u>

Deadly force is force used with the intent of causing, or which the actor knows will create a substantial risk of causing, death or serious bodily injury. Deadly force may be used only when an officer reasonably believes that the use of such force is necessary to defend <u>his or her own life or that of another person</u> in immediate danger of death or serious bodily injury. (Emphasis added.)

The U.S. Supreme Court has ruled that the use of deadly force is a seizure subject to the "reasonableness" requirement of the Fourth Amendment. Even where an officer has probable cause to arrest a subject, it may be unreasonable to do so using deadly force.

181.   John Doe 2's decision to shoot Steven was excessive and

unreasonable because he was not defending his own life or that of another <u>person</u> in imminent danger of death or serious bodily injury, and a police dog is not a person.

182.   Steven was not wanted for the commission of any serious or severe crimes.

183.   He posed little or no threat to the police or others.

184.   He put up little or no resistance other than his refusal to come out of his home and surrender to the police.

185.   Neither John Doe 2 nor any other officers or persons in the vicinity were in any immediate death or serious bodily injury.

186.   There was no risk of escape, as Steven was totally surrounded and covered by the SWAT Team.

187.   The level of control needed to secure Steven was not high, but the police decided to bring a whole SWAT Team to go against one man who was not in possession of any firearms.

188.   The police could have exercised one or more of the following non-deadly options, all of which were available to them:

a.    Use a trained and experienced crisis negotiator (MHEW or police psychologist) to achieve a peaceful resolution by speaking with Steven compassionately and persuading him to surrender so he could receive proper medical/psychiatric attention;

28

b.      Use a family member, like Steven's father or sister, to speak with Steven to persuade him to surrender and be taken to the hospital for help;

c.      Wait him out until he gets tired and falls asleep or he surrenders on his own;

d.      Use tear gas to flush him out; and/or

e.      As a last resort, use a stun grenade, also known as a flash grenade, flashbang, thunderflash or sound bomb, a non-lethal explosive device, designed to temporarily disorient a person long enough for the police to enter the room and restrain Steven.

189.    The police failed and/or refused to exercise any of these options.

<u>HPD Not Properly Trained to Handle the Mentally Ill</u>

190.    The police at all relevant times herein were not properly and adequately trained and/or supervised to handle the crisis with Steven.

191.    The police routinely and on a daily basis encounter persons who are mentally ill or mentally unstable in the course of their duties.

192.    Despite such frequent contacts, the HPD failed, neglected, and/or refused to provide competent training to its officers on the policies and procedures of handling of mentally ill persons.

193.    The HPD also failed, neglected, and/or refused to properly train its officers to take into account an individual's mental state when determining the

29

method and level of force to be used.

194.   The HPD also failed, neglected, and/or refused to properly train its officers regarding the known increased risk of using physical force to seize mentally and/or emotionally distraught individuals.

195.   The HPD's failure, neglect, and/or refusal to train and supervise amounted to deliberate indifference of constitutional rights, upon which numerous courts have found constitutional violations where officers failed to take into account a person's mental state when determining the method and level of force necessary and where an officer's use of physical force upon a mentally ill person resulted in severe injury.

196.   As a direct result of poor, inadequate, and/or lack of training and supervision, the police acted hastily and aggressively, escalated and inflamed the situation, and resorted to excessive and/or unreasonable non-deadly and deadly force, including, but not limited to, deadly force, deploying a police dog, and then shooting and killing Steven when he reacted defensively to the dog attack.

<u>HPD's Policy, Practice and Custom Dealing with the Mentally Ill</u>

197.   The HPD's longstanding policy, practice, and/or custom, and/or standard operating procedure ignores and/or disregarding the rights of people who are mentally ill when determining the method and level of force necessary to effect a seizure.

30

198.   The police failed to take into account Steven's mental disturbance in determining whether to take custody of Steven and what method and level of force to use in taking him into custody.

199.   The police failed to have a crisis negotiator or police psychologist at the scene to assist in negotiating a peaceful resolution and securing Steven to be taken to a psychiatric facility in a safe manner.

<u>No Qualified Immunity</u>

200.   John Doe 1, Silva, and John Doe 2 are not entitled to qualified immunity.

201.   STEVEN had a constitutional right to be free from unreasonable seizures under the Fourth Amendments.

202.   These rights were clearly established at the time of the alleged wrongful conduct as the statutory or constitutional right is sufficiently clear that the Defendants would have understood that what he is doing violates that right.

203.   Steven at all relevant times herein was subjected to a Fourth Amendment seizure in that he was the target of the officers' conduct and his freedom of movement was restrained by means of physical force or show of authority when the police and the SWAT Team surrounded his studio apartment, used a bullhorn to tell him to surrender, intimidated and belittled him, shot tear gas into his apartment, and shot rubber projectiles at him.

31

204.   John Doe 1, Silva, and John Doe 2 intentionally violated clearly established statutory or constitutional rights under the Fourth and Fourteenth Amendments and HPD Policy Nos. 1.04 and 4.22 and related HPD Protocol regarding the handling of persons who are mentally ill or mentally unstable, in deliberate indifference to Steven's constitutional rights.

205.   John Doe 1, Silva, and John Doe 2 terminated Steven's freedom through means intentionally applied.

206.   John Doe 1, Silva, and John Doe 2 intended to direct their physical restraint at Steven.

207.   John Doe 1, Silva, and John Doe 2's actions were objectively unreasonable.

208.   John Doe 1, Silva, and John Doe 2 knew or reasonably should have known that the actions they were taking within their sphere of official responsibility would violate Steven's constitutional rights.

<u>Municipal Liability Under § 1983</u>

209.   HPD's policies, practices, and custom have long tolerated and ratified the use of excessive and/or unreasonable force by its officers against persons who are mentally ill or mentally unstable.

210.   Since at least October 2006, the HPD has had on-duty police psychologists to handle these matters in the field involving the mentally ill, but the

32

officers fail, neglect, and/or refuse to summon and seek assistance from a MHEW and/or police psychologist.

211.  In dealing with the mentally ill in the field, the police are supposed to be trained to know how to better defuse situations involving mentally unstable people.

212.  The police are supposed to receive training meant to educate police on mental illnesses and teach officers the recommended ways to act around someone who is mentally unstable, to ensure compliance with HPD policies and procedures.

213.  In dealing with people who are mentally ill or mentally unstable, HPD policies, procedures, and guidelines require the police to call a MHEW/police psychologist; de-escalate the situation; remain calm and non-threatening; be helpful and patient; maintain adequate space between them and the subject; announce their actions before initiating them; move slowly; remove distractions, upsetting influences or disruptive people from the scene; not to stare as this may be interpreted as a threat; not to crowd or touch the subject; and not to express anger, impatience, or irritation, pursuant to HPD policies, procedures, and guidelines.

214.  John Doe 1, Silva, and John Doe 2, as well as other officers and members of the SWAT Team, violated the statutes, policies, rules, ordinances, and Fourth Amendments pursuant to a longstanding practice or custom of mishandling

33

persons who are mentally ill or mentally unstable by using excessive and/or unreasonable force to seize and detain, which became the practice and custom of the HPD and its rank and file.

215.   Since around 2005 to the present, HPD officers in a number of cases have used excessive and/or unreasonable use of deadly and/or non-lethal force against the mentally ill.

216.   In most cases, the officers were cleared of any wrongdoing and/or found to have been justified in the use of force by the HPD Professional Standards Office ("PSO").

217.   The PSO is charged with conducting investigations into allegations of police misconduct.

218.   Chief Ballard is, and was at all relevant times herein, an official final decision maker with final policy-making authority.

219.   Chief Ballard knew and/or had reason to know of recurring violations of the HPD policies, procedures, and guidelines regarding treatment of the mentally ill by HPD officers, and of the PSO's repeated findings clearing the officers of wrongful conduct, which reports and findings were presumably approved by Chief Ballard.

220.   Chief Ballard, by conscious, affirmative choice, ratified the conduct in question, in deliberate indifference to the risk that a particular

constitutional or statutory right will follow her decision.

221.   Chief Ballard's ratification is tantamount to the announcement or confirmation of the policy, practice, or custom in question, pursuant to *Monell*.

222.   Chief Ballard's ratification directly and proximately led to the deprivation of Steven's constitutional rights.

<u>COUNT I</u>
*42 U.S.C. § 1983 - Violation of the Fourth Amendment*
*of the United States Constitution and Hawaii State Constitution*

223.   Plaintiffs reallege and incorporate herein the allegations contained in the preceding paragraphs as though fully alleged herein.

224.   The police had effected a Fourth Amendment seizure against Steven, because he was the target of the police conduct by means of physical force or show of authority when the police surrounded his room with armed police officers and the SWAT Team, used a bullhorn ordering him to come out, shooting tear gas and rubber projectiles into his room, and stood by ready to deploy a police dog, all of which constituted a governmentally caused termination of Steven's freedom of movement through means intentionally applied.

225.   The use of the police dog against Steven was objectively unreasonable and/or excessive, in violation Steven's Fourth Amendment rights and HPD Policy 1.04, section VIII, subsection F (April 24, 2015), because (1) during the standoff Steven was surrounded and confined to his room and posed no imminent

35

danger to the police or the public; (2) there clearly was no immediate need to apprehend Steven; and (3) deploying the dog unnecessarily escalated the situation leading to the fatal shooting.

226.    The use of deadly force by John Doe 2 against Steven (shooting him three times) was objectively unreasonable and/or excessive, in violation Steven's Fourth Amendment rights and HPD Policy No. 1.04, subsection IX, because (1) the use of such force was not necessary to defend John Doe 2's life or that of another person; (2) John Doe's life or that of another person was not in immediate danger of death or serious bodily injury; (3) the severity of the crime was not at issue; (4) Steven did not pose a significant or immediate threat to the safety of the officers or others; (5) John Doe 2 did not give a warning before using deadly force where it was clearly practical to do so; and (6) a number of alternative methods of capturing or subduing Steven was available to the police, in deliberate indifference to Steven's civil rights under 42 U.S.C. § 1983.

227. Defendants engaged in the wrongful conduct in deliberate indifference to Steven's civil rights under the Fourth Amendment of the United States Constitution and Hawaii Constitution.

228. Defendants' wrongful conduct caused Steven to sustain damages.

229.  Defendants' wrongful conduct was a substantial factor in causing

36

damage to Steven.

230.  As a direct and proximate Defendants' wrongful acts and/or omissions, Plaintiffs sustained damages and are therefore entitled to recover special, general, compensatory, and/or punitive damages (only against John Doe 1, Silva, and John Doe 2), together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

COUNT II

*42 U.S.C. § 1983 - Violation of Fourteenth Amendment*
*of the United States Constitution and Hawaii Constitution*

231.  Plaintiffs reallege and incorporate herein the allegations contained in the preceding paragraphs as though fully alleged herein.

232.  If it is judicially determined that Steven was not "seized" by the police, Steven's civil rights under the Fourteenth Amendment of the United States Constitution and Hawaii Constitution were violated because the officers' conduct shocked the conscience, because (1) there was no immediate need to apprehend; (2) the officers were not forced to make split-second decisions; (3) any need to react rapidly arose from the officers unilaterally, without the benefit of a crisis negotiator, unnecessarily escalating the situation giving them a reason to shoot Steven dead; (4) the officers' deliberate refusal to call in a trained crisis negotiator to defuse the standoff and knowing violation of HPD policies, procedures, and protocols demonstrate that they acted with a purpose "to cause harm unrelated to the legitimate

object of arrest" or self-protection.

233.   The officers intentionally abused their authority and power by amongst other acts, surrounded and cornered Steven, intimidated and ridiculed him using a loud bullhorn, shot tear gas and rubber projectiles at him, deployed a police dog which attacked him, and the shot and killed him, all because he did not want to come out of his room, despite having prior knowledge of Steven's mental illness, in deliberate indifference to Steven's civil rights under 42 U.S.C. § 1983.

234.   The officers failed and/or refused to take consider Steven's mental illness when deciding how to approach and/or deal with him; to bring a MHEW or police psychologist with the proper training and experience to negotiate, calm, de-escalate the crisis.

235.   Defendants' wrongful conduct shocks the conscience in violation of Steven's substantive due process rights under the Fourteenth Amendment to the United States Constitution and Hawaii Constitution.

236.   Defendants' wrongful conduct caused Steven to sustain damages.

237.   Defendants' wrongful conduct was a substantial factor in causing damage to Steven.

238.   As a direct and proximate Defendants' wrongful acts and/or omissions, Plaintiffs sustained damages and are therefore entitled to recover special,

general, compensatory, and/or punitive damages (only against John Doe 1, Silva, and John Doe 2), together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

COUNT III
*42 U.S.C. § 1983 - Municipal Liability*

239.    Plaintiffs reallege and incorporate herein the allegations contained in the preceding paragraphs as though fully alleged herein.

240.    The constitutional violations committed by Defendants resulted from their deliberate and longstanding practice, custom, policy, and/or procedure of failing, neglecting, and/or refusing to consider a person's mental illness is determining the method and level of force to use and of failing to assess whether an emergency situation exists to justify the forcible seizure under the law.

241.    Since 2005 to the present, HPD officers have repeatedly and continuously violated HPD policies, procedures, and guidelines, in deliberate indifference to the constitutional rights of mentally ill persons.

242.    Since 2005 to the present, HPD officers in a number of cases have used excessive and/or unreasonable use of deadly and/or non-lethal force against the mentally ill.

243.    In most, if not all, of these cases, the officers were cleared of any wrongdoing and/or found to have been justified in the use of force by the HPD

39

Professional Standards Office ("PSO").

244.   The PSO is charged with conducting investigations into allegations of police misconduct.

245.   Chief Ballard is, and was at all relevant times herein, an official with final policy-making authority.

246.   Chief Ballard knew and/or had reason to know of recurring violations of the HPD policies, procedures, and guidelines regarding treatment of the mentally ill by HPD officers.

247.   Chief Ballard knew and/or had reason to know that the PSO was repeatedly and continuously clearing the officers of wrongful conduct.

248.   Chief Ballard approved the PSO reports and findings in these cases.

249.   Chief Ballard, by conscious, affirmative choice, ratified the conduct in question.

250.   Chief Ballard's ratification is tantamount to the announcement or confirmation of the policy, practice, or custom in question, pursuant to *Monell*.

251.   Defendants' wrongful conduct caused Steven to sustain damages.

252.   Defendants' wrongful conduct was a substantial factor in causing damage to Steven.

40

253.   As a direct and proximate Defendants' wrongful acts and/or omissions, Plaintiffs sustained damages and are therefore entitled to recover special, general, compensatory, and/or punitive damages (only against John Doe 1, Silva, and John Doe 2), together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

### COUNT IV
*Violation of Title II, Americans with Disabilities*
*Act of 1990, 42 U.S.C. § 12101, et seq.*

254.   Plaintiffs reallege and incorporate herein the allegations contained in the preceding paragraphs as though fully alleged herein.

255.   Title II of the American with Disabilities Act prohibits discrimination by a public entity by reason of a person's disability.

256.   Title II applies to arrests.

257.   Discrimination includes an officer's failure to reasonably accommodate a person's disability.

258.   Steven was mentally ill, a disability which required the Defendants to take him into custody in a manner that reasonably accommodated his disability pursuant the ADA, 42 U.S.C. § 12101 et seq.

259.   Defendants violated Steven's rights under the ADA, 42 U.S.C. § 12101 et seq., by, among other things, (1) failing, neglecting, and/or refusing to

comply with the directive of the police psychologist to take Steven into custody and transported him to a designated, licensed psychiatric facility in a safe manner without killing him, pursuant to HPD Policy No. 4.22; (2) failing, neglecting, and/or refusing to summon a crisis negotiator or police psychologist to the scene and reason and persuade Steven into surrendering and going to the hospital; (3) failing, neglecting, and/or refusing to address Steven in a calm and nonthreatening manner to persuade him voluntarily and peaceably to be taken to the hospital; and/or (3) calling in the SWAT Team and resorting to the use of excessive and/or unreasonable deadly and non-deadly force.

260. Defendants' wrongful conduct caused Steven to sustain damages.

261. Defendants' wrongful conduct was a substantial factor in causing damage to Steven.

262. As a direct and proximate Defendants' wrongful acts and/or omissions, Plaintiffs sustained damages and are therefore entitled to recover special, general, compensatory, and/or punitive damages (only against John Doe 1, Silva, and John Doe 2), together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT V
### *Wrongful Death*

263.   Plaintiffs reallege and incorporate herein the allegations contained in the preceding paragraphs as though fully alleged herein.

264.   Defendants' unlawful and tortious conduct toward Steven included unwelcome, unpermitted, unwarranted and offensive contact or apprehension thereof, thereby causing Steven's pain, suffering, and death.

265.   Defendants' wrongful conduct was outrageous and were done with malice and with the intent to cause severe injury and/or death to Steven.

266.   Defendants' wrongful conduct caused Plaintiffs to sustain damages.

267.   Defendants' wrongful conduct was a substantial factor in causing damage to Plaintiffs.

268.   As a direct and proximate Defendants' wrongful acts and/or omissions, Plaintiffs sustained damages and are therefore entitled to recover special, general, compensatory, and/or punitive damages (only against John Doe 1, Silva, and John Doe 2), together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT VI
### *Negligent Training and Supervision*

269.   Plaintiffs reallege and incorporate herein the allegations

43

contained in the preceding paragraphs as though fully alleged herein.

270.   Defendants City, HPD, and John Doe 1 owed a duty to Plaintiffs to properly train the HPD officers under its control so as to avoid the unreasonable risk of harm to citizens including, but not limited to, properly training and supervising its officers in the proper use, approach, communication, restraint, and/or use of force in dealing with mentally ill persons.

271.   Defendants City, HPD, and John Doe 1 breached their duty of care to Plaintiffs by failing to train and supervise its police officers on the proper handling of mentally ill persons.

272.   Defendants City, HPD, and John Doe 1's wrongful conduct caused Plaintiffs to sustain damages.

273.   Defendants City, HPD, and John Doe 1's wrongful conduct was a substantial factor in causing damage to Plaintiffs.

274.   As a direct and proximate Defendants' wrongful acts and/or omissions, Plaintiffs sustained damages and are therefore entitled to recover special and general, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT VII
*Negligence*

275.   Plaintiffs reallege and incorporate herein the allegations

44

contained in the preceding paragraphs as though fully alleged herein.

276.   Defendants owed a duty of care to Plaintiffs to protect them from foreseeable risk of harm.

277.   Defendants breached their duty to Plaintiffs.

278.   Defendants' wrongful conduct caused Plaintiffs to sustain damages.

279.   Defendants' wrongful conduct was a substantial factor in causing damage to Plaintiffs.

280.   As a direct and proximate Defendants' wrongful acts and/or omissions, Plaintiffs sustained damages and are therefore entitled to recover special and general damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT VIII
*Gross Negligence*

281.   Plaintiffs reallege and incorporate herein the allegations contained in the preceding paragraphs as though fully alleged herein.

282.   Defendant acted with reckless disregard of the need to use reasonable care, which was likely to cause foreseeable injury or harm to Plaintiffs.

283.   Defendants' wrongful conduct caused Plaintiffs to sustain damages.

284.   Defendants' wrongful conduct was a substantial factor in causing damage to Plaintiffs.

285.   As a direct and proximate Defendants' wrongful acts and/or omissions, Plaintiffs sustained damages and are therefore entitled to recover special, general, compensatory, and/or punitive damages (only against John Doe 1, Silva, and John Doe 2), together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT IX
*Intentional Infliction of Emotional Distress*

286.   Plaintiffs reallege and incorporate herein the allegations contained in the preceding paragraphs as though fully alleged herein.

287.   Defendants' wrongful conduct was intentional.

288.   Defendants' conduct was outrageous, beyond bounds of decency, willful and wanton, and/or malicious.

289.   Defendants' wrongful conduct caused Plaintiffs to sustain damages.

290.   Defendants' wrongful conduct was a substantial factor in causing damages to Plaintiffs.

291.   As a direct and proximate Defendants' wrongful acts and/or omissions, Plaintiffs sustained damages and are therefore entitled to recover special,

46

general, compensatory, and/or punitive damages (only against John Doe 1, Silva, and John Doe 2), together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

COUNT X

*Negligent Infliction of Emotional Distress*

292.    Plaintiffs reallege and incorporate herein the allegations contained in the preceding paragraphs as though fully alleged herein.

293.    Defendants caused Plaintiffs to suffer serious emotional distress or disturbance.

294.    Defendants caused a person to suffer demonstrable physical injury and/or mental illness.

295.    Defendants' wrongful conduct was a substantial factor in causing damage to Plaintiffs.

296.    As a direct and proximate Defendants' wrongful acts and/or omissions, Plaintiffs sustained damages and are therefore entitled to recover special and general damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

WHEREFORE, Plaintiffs pray for Judgment in their favor and against Defendants, jointly and severally, as follows:

A.    Special damages in an amount to be determined at a trial or

47

hearing hereof;

      B.     General damages in an amount to be determined at a trial or hearing hereof;

      C.     Compensatory damages in an amount to be determined at a trial or hearing hereof;

      D.     Punitive damages (only against John Doe 1, Silva, and John Doe 2) in an amount to be determined at a trial or hearing hereof;

      E.     Reasonable attorneys' fees and costs;

      F.     Pre-judgment interest and post-judgment interest; and

      G.     Any and all other relief as may be deemed just and equitable by the Court.

      DATED: Honolulu, Hawaii, October 25, 2019.

> /s/ Peter C. Hsieh
> PETER C. HSIEH
> GEORGE A. BURKE
> Attorneys for Plaintiffs
> STEVEN A. HYER, Individually
> and as Personal Representative of THE
> ESTATE OF STEVEN K. HYER, and
> CASSI H. HYER

/   /   /

/   /   /

48

DATED: Honolulu, Hawaii, October 25, 2019.

/s/ Myles S. Breiner
MYLES S. BREINER
Attorney for Plaintiffs
THERESA L. CHANG THOMAS
FUJIMOTO, and JAMES FUJIMOTO, JR.

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| STEVEN A. HYER, Individually and as Personal Representative of THE ESTATE OF STEVEN K. HYER, CASSI H. HYER, THERESA L. CHANG, THOMAS FUJIMOTO, JAMES FUJIMOTO, JR., | CIVIL NO. _____<br><br>DEMAND FOR JURY TRIAL |
| Plaintiffs, | |
| vs. | |
| CITY AND COUNTY OF HONOLULU, HONOLULU POLICE DEPARTMENT, SUSAN BALLARD, Chief of Police of the Honolulu Police Department, JOHN DOE 1, individually and in his official capacity as Field Supervisor, WAYNE SILVA, individually and in his official capacity as Police Officer K-9 Handler of the Honolulu Police Department, JOHN DOE 2, individually and in his official capacity as Police Officer of the Honolulu Police Department, JOHN DOES 4-10, JANE DOES 1-10, DOE CORPORATIONS 1-10, DOE PARTNERSHIPS 1-10, DOE UNINCORPORATED ORGANIZATIONS 1-10, | |
| Defendants. | |

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues triable of right by

jury in this case, pursuant to Rule 38, Federal Rules of Civil Procedure.

DATED: Honolulu, Hawaii, October 25, 2019.

/s/ Peter C. Hsieh
PETER C. HSIEH
GEORGE A. BURKE
Attorneys for Plaintiffs
STEVEN A. HYER, Individually
and as Personal Representative of THE
ESTATE OF STEVEN K. HYER, and
CASSI H. HYER

DATED: Honolulu, Hawaii, October 25, 2019.

/s/ Myles S. Breiner
MYLES S. BREINER
Attorney for Plaintiffs
THERESA L. CHANG THOMAS
FUJIMOTO, and JAMES FUJIMOTO, JR.

2

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| STEVEN A. HYER, Individually and as Personal Representative of THE ESTATE OF STEVEN K. HYER, CASSI H. HYER, THERESA L. CHANG, THOMAS FUJIMOTO, JAMES FUJIMOTO, JR., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY AND COUNTY OF HONOLULU, HONOLULU POLICE DEPARTMENT, SUSAN BALLARD, Chief of Police of the Honolulu Police Department, JOHN DOE 1, individually and in his official capacity as Field Supervisor, WAYNE SILVA, individually and in his official capacity as Police Officer K-9 Handler of the Honolulu Police Department, JOHN DOE 2, individually and in his official capacity as Police Officer of the Honolulu Police Department, JOHN DOES 4-10, JANE DOES 1-10, DOE CORPORATIONS 1-10, DOE PARTNERSHIPS 1-10, DOE UNINCORPORATED ORGANIZATIONS 1-10, <br><br> Defendants. | CIVIL NO. _____ <br><br> SUMMONS |

<u>SUMMONS</u>

STATE OF HAWAII

To the above-named Defendants:

       You are hereby summoned and required to file with the court and serve upon **(1)** Peter C. Hsieh and George A. Burke, attorneys for Plaintiffs STEVEN A. HYER, Individually and as Personal Representative of THE ESTATE OF STEVEN K. HYER, and CASSI H. HYER, whose service address is Davies Pacific Center, 841 Bishop St., Suite 2201, Honolulu, Hawaii 96813, **and** **(2)** Myles S. Breiner, attorney for Plaintiffs THERESA L. CHANG, THOMAS FUJIMOTO, and JAMES FUJIMOTO, JR., whose service address is 1003 Bishop Street, Suite 2150, Honolulu, Hawaii 96813, an answer to the Complaint which is herewith served upon you, within 21 days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

       **WARNING TO DEFENDANT(S):**  Failure to obey this summons may result in an entry of default and default judgment against the disobeying person or party.

       **PROCESS SERVER**:   You are prohibited from making personal delivery of this summons between 10:00 p.m. and 6:00 a.m. on premises not open to

2

the public, unless a judge of the district or circuit courts permits, in writing on the

summons, personal delivery during those hours.

DATED: Honolulu, Hawaii, _____.


_____
CLERK OF THE ABOVE-ENTITLED COURT

3