IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STEVEN A. HYER, Individually and as Personal Representative of the Estate of Steven K. Hyer; CASSI H. HYER; THERESA L. CHANG,<br><br>          Plaintiffs,<br><br>     vs.<br><br>CITY AND COUNTY OF HONOLULU; PAUL V. NOBRIGA, in his individual capacity; WAYNE SILVA, in his individual capacity; MALO B. TORRES, in his individual capacity,<br><br>          Defendants. | CIV. NO. 19-00586 HG-RT |

**ORDER GRANTING DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION FOR SUMMARY JUDGMENT (ECF No. 124)**

**and**

**GRANTING DEFENDANTS PAUL V. NOBRIGA, WAYNE SILVA, AND MALO B. TORRES' MOTION FOR QUALIFIED IMMUNITY AND MOTION FOR SUMMARY JUDGMENT (ECF No. 126)**

The lawsuit arises from calls to police about threats made by Steven K. Hyer to fellow tenants at their apartment house.

Honolulu Police Officers' first encounter with Hyer began in the early evening on June 22, 2018, around 6:00 p.m. Police officers arrived and met with Hyer. They found Hyer was agitated, but they determined that the situation with the tenants of other units at the rental home had abated.

Less than two hours later, police were called to the

1

residence a second time.  Hyer was considerably more agitated than on the first visit.  Hyer was pacing his residence, yelling out of the window about Satan and dead people in the walls of his apartment, and threatening to "kick his neighbor's ass."  It was also reported that Hyer attempted to break in to a co-tenant's unit and parts of the house that he was not permitted to access. Hyer refused to calm down when police officers spoke with him. The officers observed that Hyer "was not making any sense when he spoke."

The police consulted with a police psychologist about Hyer's bizarre and threatening behavior.  The police psychologist instructed the officers to detain Hyer for a mental health evaluation.  The process of attempting to implement the police psychologist's order lasted for over six hours.  Hyer barricaded himself inside his studio and repeatedly refused to comply with police officer instructions.

Police officers utilized various methods to try to place Hyer in protective custody.  Officers made verbal approaches, repeatedly requested that Hyer peacefully surrender, and utilized a variety of less than lethal force strategies in an effort to detain Hyer.  Hyer appeared from his barricaded studio periodically.  He yelled "kill me," taunted the officers, and brandished weapons, including a knife and a compound bow and arrow.

The encounter ended in the early morning of June 23, 2018,

at around 3:30 a.m.  After more than eight hours following the first calls to police, officers deployed a police dog to capture Hyer.  Hyer retreated into the studio followed by the police dog and officers.  Resisting capture, Hyer stabbed the dog repeatedly with an arrow and then swung the arrow at the officers.  Hyer was loading his compound bow when he was shot by an officer.

## CASE HISTORY

The case was initially filed on October 25, 2019.

On January 26, 2021, Plaintiffs filed a Second Amended Complaint.  The Court had previously issued two orders ruling on Defendants' two motions to dismiss.

On May 27, 2021, the Court issued a third order, granting, in part, and denying, in part, Defendants' Motion for Partial Dismissal of the Second Amended Complaint.

Before the Court today are two separate Motions for Summary Judgment filed by Defendants.

## DEFENDANTS PAUL V. NOBRIGA, WAYNE SILVA, AND MALO B. TORRES' MOTION FOR QUALIFIED IMMUNITY AND FOR SUMMARY JUDGMENT (ECF No. 126)

Defendants Paul V. Nobriga, Wayne Silva, and Malo B. Torres ("Individual Officers") seek qualified immunity for the excessive force claim against them.  They also seek summary judgment on the basis that the use of force was objectively reasonable based on the undisputed facts in the record.  Finally, they seek

3

conditional privilege for the remaining state law claims against
them.

Defendant Officers' Motion seeking qualified immunity is
**GRANTED.**

Defendant Officers are entitled to summary judgment as to
the excessive force and state law claims.  There are no genuine
disputes of material fact in the record.  The undisputed facts
establish that the Officers did not engage in excessive force in
violation of the Fourth Amendment to the United States
Constitution.  Defendant Officers are entitled to conditional
privilege as to the state law claims against them.

Defendant Officers' Motion for Summary Judgment (ECF No.
126) is **GRANTED.**

**DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION FOR SUMMARY
JUDGMENT (ECF No. 124)**

Defendant City and County of Honolulu also filed a Motion
for Summary Judgment for all claims against it.

Plaintiffs have not established a violation of Title II of
the Americans With Disabilities Act.  There is no evidence that
the police officers discriminated against Steven K. Hyer on
account of any disability.

Defendant City and County of Honolulu is entitled to summary
judgment on the state law causes of action brought against it
because there is no basis to find respondeat superior liability.

4

Defendant City and County of Honolulu's Motion for Summary Judgment (ECF No. 124) is **GRANTED.**

## EVIDENTIARY RULINGS

### A.   Police Reports

In support of their position, Plaintiffs submitted police reports from the night of the encounter with their Concise Statement of Facts in Opposition to Defendants' Motions for Summary Judgment. (ECF Nos. 138 and 140).

Defendants object to the use of the police reports and argue they are hearsay and should not be considered at summary judgment.

The proper inquiry at the summary judgment stage is not the admissibility of the evidence's form, but whether the contents of the evidence are admissible.  Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).  There is no question as to the authenticity of the police reports filed by Plaintiffs.  See Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002).  The police reports were provided by Defendants in discovery.  (Hsieh Decl. at ¶¶ 5-7, 10-14, 16-19, ECF No. 138-4).  The question is whether the police reports may be relied upon at summary judgment, specifically where the Court is required to consider the record in a light most favorable to Plaintiffs when reviewing Defendants' Motions.  Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) (en banc).

Plaintiffs have asked that the reports be considered.  The police reports contain relevant, probative information that could be presented in an admissible form at trial.  <u>Lawrence v. City and Cnty. of San Francisco</u>, 258 F.Supp.3d 977, 986 (N.D. Cal. June 15, 2017) (finding police reports may be considered at summary judgment because the information can be presented at trial through the testimony of the author of the reports).  The Court may rely upon the statements contained in the police reports in evaluating the Motions for Summary Judgment.

Defendants' Objection to the police reports is **OVERRULED.**

**B.**  **Plaintiffs' Expert Reports**

Defendants also object to the admissibility of the expert reports submitted by the Plaintiffs in Opposition to Defendants' Motions for Summary Judgment.

The United States Supreme Court has held that a trial court must act as a "gatekeeper" in determining whether to admit or exclude expert evidence in accordance with Fed. R. Evid. 702.  <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 597 (1993).  To be admissible, expert testimony must be "not only relevant, but reliable."  <u>Id.</u> at 589.

Plaintiffs offer three expert opinions: (1) the opinion of A.E. Daniel, M.D. about how he believes the officers should have treated Hyer given his mental state (ECF No. 140-5); (2) the opinion of Scott A. DeFoe about his beliefs as to how the police

officers should have acted pursuant to police policies (ECF No. 140-6); and, (3) the opinion of Kris Sperry, M.D. containing his own speculation about what happened at the time of the shooting. (ECF No. 140-7).

Plaintiffs' expert reports are inadmissible and do not create a genuine dispute of material fact to preclude summary judgment.

First, the expert reports inappropriately attempt to introduce facts that are not found anywhere in the record. Expert reports may not introduce facts.  The experts are not fact witnesses.  Plaintiffs may not use the expert reports to assert facts for purposes of summary judgment.  Smith v. City of Huntsville, 2016 WL 5746216, *4 n.9 (N.D. Ala. Sept. 30, 2016) (explaining that a plaintiff cannot rely on an expert opinion to introduce facts or attempt to introduce facts based on the expert's own assumptions in a motion for summary judgment).  The experts have no personal knowledge of the events that took place and no basis to provide testimony as to the facts here.  Fed. R. Evid. 602.

Second, the expert reports are speculative and unreliable. The evidence regarding the shooting is limited to the police reports, the autopsy, and declarations and depositions of the police officers at the scene.  The expert reports attempt to offer opinions based on their own speculation and assumptions about the facts rather than the actual evidence.

The expert report of Dr. Sperry, in particular, is based on wild speculation and conjecture.  Dr. Sperry's report is based on purely hypothetical assumptions and not evidence.  Dr. Sperry's three page report lacks reliability.  There is no methodology provided in the report.  It contains conclusory opinions.  Laux v. Mentor Worldwide, LLC, 295 F.Supp.3d 1094, 1102-03 (C.D. Cal. Nov. 8, 2017) (excluding a medical expert from providing his opinion where his expert report failed to explain his methodology and was based simply on the medical doctor's "because I said so" opinion, without facts, data, or reliable principles and methods to support the conclusion).

Sperry's report makes assumptions about the "conventional position" used when shooting a compound bow and makes conclusions based on hypothetical speculation.  Expert opinions without a factual basis and based on speculation or conjecture are inadmissible at trial.  Such an expert report should be disregarded and should not be considered in evaluating a motion for summary judgment.  Plunkett v. Best Buy Co., Inc., 2017 WL 4958579, *4 (W.D. Wash. Oct. 31, 2017).

Third, the expert reports attempt to introduce legal conclusions that would usurp the role of the Court in instructing the jury as to the applicable law.  Nationwide Transport Fin. v. Cass Info. Sys., Inc., 523 F.3d 1051, 1058 (9th Cir. 2008).

Defendants' Objections to the Plaintiffs' expert reports are **SUSTAINED**.  The expert reports are **INADMISSIBLE**.

## PROCEDURAL HISTORY

On October 25, 2019, Plaintiffs Steven A. Hyer, individually and as personal representative of the Estate of Steven K. Hyer; Cassi H. Hyer; Theresa L. Chang; Thomas Fujimoto; and James Fujimoto, Jr. filed a Complaint.  (ECF No. 1).

On February 5, 2020, Defendants City and County of Honolulu; Susan Ballard; and Wayne Silva filed DEFENDANTS CITY AND COUNTY OF HONOLULU, SUSAN BALLARD, AND WAYNE SILVA'S MOTION TO DISMISS PORTIONS OF THE COMPLAINT FILED ON OCTOBER 25, 2019.  (ECF No. 12).

On June 10, 2020, the Court held a hearing on the Motion to Dismiss.  (ECF No. 26).

On June 23, 2020, the Court issued an ORDER GRANTING DEFENDANTS CITY AND COUNTY OF HONOLULU, SUSAN BALLARD, AND WAYNE SILVA'S MOTION TO DISMISS PORTIONS OF THE COMPLAINT.  (ECF No. 27).

On July 31, 2020, Plaintiffs Steven A. Hyer, individually and as personal representative of the Estate of Steven K. Hyer; Cassi H. Hyer; and Theresa L. Chang filed a FIRST AMENDED COMPLAINT.  (ECF No. 28).

On August 19, 2020, Defendants Wayne Silva and the City and County of Honolulu filed a Motion to Dismiss the First Amended Complaint.  (ECF No. 32).

On October 28, 2020, the Court held a hearing on Defendants City and County of Honolulu and Wayne Silva's Motion to Dismiss

9

the First Amended Complaint.  (ECF No. 48).

On November 30, 2020, the Court issued an ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS CITY AND COUNTY OF HONOLULU AND WAYNE SILVA'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT.  (ECF No. 49).  Plaintiffs were granted until January 12, 2021 to file a Second Amended Complaint.  (Id.)

On January 11, 2021, Plaintiffs filed an EX PARTE MOTION FOR FIRST EXTENSION OF TIME TO FILE SECOND AMENDED COMPLAINT.  (ECF No. 51).

On January 12, 2021, the Court issued a Minute Order granting Plaintiffs' Motion for Extension of Time.  (ECF No. 52).

On January 26, 2021, Plaintiffs filed their SECOND AMENDED COMPLAINT.  (ECF No. 55).

On February 16, 2021, Defendants City and County of Honolulu, Paul V. Nobriga, Wayne Silva, and Malo B. Torres filed a MOTION FOR PARTIAL DISMISSAL OF THE SECOND AMENDED COMPLAINT AND ATTENDANT MOTION FOR AN ENLARGEMENT OF TIME TO ANSWER THE SECOND AMENDED COMPLAINT.  (ECF No. 58).

On April 22, 2021, the Court held a hearing on Defendants' Motion for Partial Dismissal of the Second Amended Complaint.  (ECF No. 68).

On May 27, 2021, the Court issued an ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS CITY AND COUNTY OF HONOLULU, PAUL V. NOBRIGA, WAYNE SILVA, AND MALO B. TORRES'S MOTION FOR PARTIAL DISMISSAL OF THE SECOND AMENDED COMPLAINT.

(ECF No. 71).

On April 20, 2022, Defendant City and County of Honolulu filed its Motion for Summary Judgment.  (ECF No. 124).

On the same date, Defendants Paul V. Nobriga, Malo B. Torres, and Wayne Silva filed their Motion for Summary Judgment. (ECF No. 126).

On May 6, 2022, Plaintiffs filed their Oppositions to Defendants' Motions, but the Oppositions were stricken for failing to comply with the Local Rules for the District of Hawaii.  (ECF Nos. 132-36).

The Court granted Plaintiffs an extension of time to file Oppositions in conformity with the rules.  (ECF No. 136).

On May 18, 2022, Plaintiffs filed their Oppositions to Defendants' Motions for Summary Judgment.  (ECF Nos. 137, 139).

On May 19, 2022, Plaintiffs filed an Errata.  (ECF No. 142).

On May 31, 2022, Defendants filed their Replies.  (ECF Nos. 144, 146).

On June 6, 2022, the Court held a hearing on Defendants' Motions for Summary Judgment.  (ECF No. 148).

On October 17, 2022, the Court held a Status Conference, following the Parties' Stipulation To Take Depositions After Discovery Cutoff until August 22, 2022.  (ECF No. 165).

On October 24, 2022, Plaintiff filed a Motion For Leave To Supplement Evidence In Support Of Plaintiffs' Oppositions To Defendants' Motions for Summary Judgment.  (ECF No. 167).

On October 26, 2022, the Court granted, in part, Plaintiffs'
Motion To Supplement The Record.  (ECF No. 169).

On November 2, 2022, Defendants filed a Motion For
Reconsideration, which was denied.  (ECF Nos. 170, 172).

On November 4, 2022, Plaintiffs filed their Sur-Reply
Concise Statement Of Facts.  (ECF No. 171).

On November 9, 2022, Defendants filed a Motion to Strike,
which was denied.  (ECF Nos. 173, 175).

On November 14, 2022, Defendants filed their Response to
Plaintiffs' Sur-Reply.  (ECF No. 174).

## BACKGROUND

**The Following Facts Are Undisputed Unless Otherwise Stated:**
**HYER'S FIRST ENCOUNTER WITH POLICE AT APPROX. 6:00 P.M.**

On June 22, 2018, at approximately 6:00 p.m., Honolulu
Police Department ("HPD") patrol officers responded to a 911 call
saying that Steven K. Hyer ("Hyer") was out of control and
behaving erratically at his residence.  (Declaration of Honolulu
Police Detective Robert H. Jones ("Jones Decl.") at ¶ 7, ECF No.
127-7).

Hyer resided in Haleiwa, a small beach community on the
North Shore of Oahu.  (Id. at ¶ 5).  Hyer rented a studio inside
a two-story dwelling that was separated into several rental
units.  (Id.)  The home was located in a residential area.
Hyer's studio was located in the back of the dwelling, and it

could only be entered from a sliding glass door that opened onto a small wooden deck.  (Honolulu Police Department Diagram, attached as Ex. 20 to Pl.'s Opp., ECF No. 140-24; Jones Decl. at ¶¶ 3, 5-6, 12, ECF No. 127-7).

The studio consisted of a single room with an attached bathroom.  (Id.)  In the studio, there was a partitioned area covered by a black canvas that enclosed several marijuana plants. (Honolulu Police Report 18-236857, by Paul V. Nobriga, attached as Ex. 12 to Pl.'s Opp., ECF No. 140-16).  Officers referred to the area as the "grow room."  (See Diagram).



13

When the patrol officers arrived at the scene, they met with Hyer, who appeared agitated.  (Honolulu Police Report 18-236857, by Frances L. Bolibol, attached as Ex. 6 to Pl.'s Opp., ECF No. 140-10).  The officers were told that Hyer had been ripping screens in the dwelling.  (Id.)  The officers determined that the confrontation between Hyer and the other tenants in the rental property had abated and they left.  (Jones Decl. at ¶ 9, ECF No. 127-7).

**HYER'S SECOND ENCOUNTER WITH POLICE AT APPROX. 8:00 P.M.**

Approximately two hours later, a series of new 911 calls were made about Hyer's behavior.  The callers claimed Hyer was yelling out of his window about Satan and dead people in the walls of his apartment, and that Hyer was threatening other tenants in the building and attempted to break in to their units.  (Id. at ¶¶ 26-28; Honolulu Police Report 18-236857, by Frances L. Bolibol, attached as Ex. 6 to Pl.'s Opp., ECF No. 140-10).

The arriving officers observed Hyer's bizarre, erratic, and threatening behavior.  (Honolulu Police Report 18-236857, by Frances L. Bolibol, at p. 2, ECF No. 140-10).  Officer Frances Bolibol contacted police psychologist Dr. Vincent Tsushima to consult.  (Id.)  Based on Hyer's reported behavior, Dr. Tsushima concluded Hyer was a danger to himself and others, and was extremely combative.  The doctor concluded there was reason to believe Hyer was in need of immediate psychological or medical

14

attention.  Dr. Tsushima concluded there was no suitable less restrictive alternative available other than involuntary examination.  (Id.; Application by Police Office for Emergency Examination & Treatment, attached as Ex. 7 to Pl.'s Opp., ECF No. 140-11).  Dr. Tsushima instructed the officers to take Hyer into protective custody for a mental health evaluation to Castle Medical Center.  (Honolulu Police Report 18-236857, by Frances L. Bolibol, at p. 2, ECF No. 140-10).

The officers approached Hyer's studio and called for him to come out.  (Id.)  Hyer stepped out onto the deck in front of his studio.  Hyer appeared "very agitated and hyper."  (Id.)  Hyer said he was not going anywhere and told the officers to leave. (Id.)  Hyer would not allow the officers on the deck.  (Id.) Hyer was ordered to open the gate to the deck and he refused. (Id.)

**HYER YELLED "KILL ME" AT OFFICERS AND BRANDISHED A KNIFE**

Hyer's tone of voice became more angry and he repeatedly said the officers were disrespecting him.  (Honolulu Police Report 18-236857, by Frances L. Bolibol, at p. 2, attached as Ex. 6 to Pl.'s Opp., ECF No. 140-10).  Officers tried to open the gate to the deck, and Hyer responded by running inside, locking the sliding glass door, and brandishing a knife.  (Id.)  Hyer said, "go ahead just kill me" as he pounded his chest.  (Id.) Hyer opened the sliding glass door with the knife in his right

15

hand.  (Id.)  Officers approached and instructed Hyer to drop the
knife several times.  (Id.)  Hyer refused.  (Id.)

Officers used a Taser to try and detain Hyer, but it did not
immobilize him.  (Id.)  Hyer fell, quickly got up, closed the
sliding glass door, and barricaded himself inside the studio.
(Id.)

**SPECIALIZED SERVICES OFFICERS ARRIVE AT APPROX. 11:30 P.M.**

At approximately 11:30 p.m., the patrol officers, who
initially responded to the calls and had been on duty and at the
site for many hours, were relieved from their roles.  It was
decided that two teams of Specialized Services officers were
necessary to gain control over Hyer.  (Declaration of Darren
Chun, Assistant Chief of the Honolulu Police Department, ("Chun
Decl.") at ¶¶ 9-15, ECF No. 127-6).

Measures were taken to deal with the dark, surrounding
vegetation in order to protect the police officers.  (Declaration
of Paul V. Nobriga, Retired Sergeant of the Honolulu Police
Department ("Nobriga Decl.") at ¶¶ 38-39, ECF No. 127-3).  During
this period, Hyer had armed himself with a compound bow loaded
with an arrow.  (Declaration of Honolulu Police Officer Jared
Nomura ("Nomura Decl.") at ¶ 15, ECF No. 127-5).

The police efforts to gain control over Hyer, in order to
take him in for a mental and medical examination, included a
series of steps.  The efforts made to take him into custody with

his cooperation failed.  His bizarre behavior escalated.  A Taser was unsuccessful in disabling him long enough to detain him.  The deploying of tear gas into his studio by two methods did not seem to affect him.  He did not vacate the barricaded residence.  An attempt to capture him by use of a canine takedown resulted in Hyer stabbing the dog with an arrow.  (Declaration of Honolulu Police Corporal Wayne K. Silva, ("Silva Decl.") at ¶¶ 27-32, ECF No. 127-2).  Hyer then turned the compound bow and the arrow toward the officers and was shot as he attempted to load and shoot.  (Declaration of Malo B. Torres, Retired Corporal of the Honolulu Police Department ("Torres Decl.") at ¶¶ 22-31, ECF No. 127-1; Nomura Decl. at ¶¶ 36-37, ECF No. 127-5; Deposition of Wayne Silva ("Silva Depo.") at p. 157, ECF No. 171-8; Declaration of Honolulu Police Corporal John Otto ("Otto Decl.") at ¶¶ 24-25, ECF No. 127-4).  At approximately 3:10 a.m., Hyer was taken by ambulance to Kahuku Medical Center, where he was pronounced dead. (Otto Decl. at ¶¶ 33-34, ECF No. 127-4).

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  To defeat summary judgment "there must be sufficient evidence that a reasonable jury could return a verdict for the nonmoving party." Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir.

1997) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

The moving party has the initial burden of "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  The moving party, however, has no burden to negate or disprove matters on which the opponent will have the burden of proof at trial.  The moving party need not produce any evidence at all on matters for which it does not have the burden of proof.  <u>Celotex</u>, 477 U.S. at 325.  The moving party must show, however, that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law.  That burden is met by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. <u>Id.</u>

If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of probative evidence tending to support its legal theory. <u>Commodity Futures Trading Comm'n v. Savage</u>, 611 F.2d 270, 282 (9th Cir. 1979).  The opposing party must present admissible evidence showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); <u>Brinson v. Linda Rose Joint Venture</u>, 53 F.3d 1044, 1049 (9th Cir. 1995).  "If the evidence is merely

18

colorable, or is not significantly probative, summary judgment may be granted." Nidds, 113 F.3d at 916 (quoting Anderson, 477 U.S. at 249-50).

The court views the facts in the light most favorable to the non-moving party. State Farm Fire & Cas. Co. v. Martin, 872 F.2d 319, 320 (9th Cir. 1989). Opposition evidence may consist of declarations, admissions, evidence obtained through discovery, and matters judicially noticed. Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324. The opposing party cannot, however, stand on its pleadings or simply assert that it will be able to discredit the movant's evidence at trial. Fed. R. Civ. P. 56(e); T.W. Elec. Serv., 809 F.2d at 630. The opposing party cannot rest on mere allegations or denials. Fed. R. Civ. P. 56(e); Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 959-60 (9th Cir. 1994). "When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." Hansen v. U.S., 7 F.3d 137, 138 (9th Cir. 1993); see also Nat'l Steel Corp. v. Golden Eagle Ins. Co., 121 F.3d 496, 502 (9th Cir. 1997).

## **ANALYSIS**

The Individual Defendant Police Officers: (1) Paul V. Nobriga, (2) Wayne Silva, and (3) Malo B. Torres have a filed a Motion for Summary Judgment.

First, the Defendant Officers assert that they are entitled to summary judgment on the Excessive Force claim against them because there is no genuine dispute of material facts that they did not engage in excessive force in attempting to detain Hyer.

Second, the Defendant Officers argue that even if they engaged in excessive force, they are entitled to qualified immunity.  They assert there was no clearly established law at the time of the shooting to demonstrate that their actions violated the United States Constitution.

Third, the Defendant Officers assert that they are entitled to conditional privilege as to any state law claims against them because there is no genuine dispute of material fact that they did not act with malice when attempting to detain Hyer.

The Defendant City and County of Honolulu filed its own Motion for Summary Judgment on the basis that Plaintiffs have failed to demonstrate a claim against it.

The Court will first analyze the substantive Excessive Force claim against the Individual Officers and then turn to their request for qualified immunity.

## I.   Plaintiffs' Claim For Excessive Force Against The Individual Officers

Plaintiffs attempt to bring a claim of excessive force in violation of the Fourth Amendment to the United States Constitution against the Individual Defendant Officers: (1) Paul V. Nobriga, (2) Wayne Silva, and (3) Malo B. Torres pursuant to

42 U.S.C. § 1983.

Section 1983 provides that "[e]very person who, under color of any [state law] subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured...."  42 U.S.C. § 1983. Section 1983 does not create substantive rights, but it merely serves as the procedural device for enforcing substantive provisions of the United States Constitution and federal statutes.  Crumpton v. Gates, 947 F.2d 1418, 1420 (9th Cir. 1991).

Plaintiffs assert the Individual Officer Defendants engaged in excessive force and violated Steven K. Hyer's federal constitutional right to be free from unreasonable seizures.

## II. Plaintiffs' Excessive Force Claim Is Analyzed Pursuant To The Factor Test Set Forth In Graham v. Connor, 490 U.S. 386, 388 (1989)

An excessive force claim is analyzed pursuant to the Fourth Amendment objective reasonableness standard set forth in Graham v. Connor, 490 U.S. 386, 388 (1989).

Graham requires the court to determine whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.  Hooper v. Cnty. of San Diego, 629 F.3d 1127, 1133 (9th Cir. 2011).  The "objectively reasonable" test requires the Court to assess:

21

> (1)  first, the gravity of the intrusion by evaluating the type and amount of force inflicted; and,
>
> (2)  second, to balance the extent of the intrusion against the government's interests.

Miller v. Clark Cnty., 340 F.3d 959, 964 (9th Cir. 2003).

### A.   Quality Of The Intrusion

The Court begins the analysis by assessing both the type and amount of force used.  Bryan v. MacPherson, 630 F.3d 805, 824 (9th Cir. 2010).

Qualifying a particular use of force requires consideration of the factual circumstances surrounding the event.  Seidner v. De Vries, 39 F.4th 591, 596-97 (9th Cir. 2022).  The nature and degree of physical contact, the risk of harm, and the actual harm experienced are important to the analysis.  Id.

Here, it is undisputed that deadly force, the highest degree of force, was employed by Defendant Torres.  Blanford v. Sacramento Cnty., 406 F.3d 1110, 1115 n.9 (9th Cir. 2005).  The use of deadly force implicates the highest level of Fourth Amendment interests.  A.K.H. by & through Landeros v. City of Tustin, 837 F.3d 1005, 1011 (9th Cir. 2016).

### B.   Government Interest In Use Of Force

Excessive force claims are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.  Cnty. of Los Angeles, Calif. v. Mendez,

22

581 U.S. 420, 428 (2017). "That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim." Id.

Courts must consider a number of factors in analyzing the government's interest in the use of force including:

(1)   the severity of the crime;

(2)   whether the suspect posed an immediate threat to the safety of the officers or others;

(3)   whether the suspect actively resisted arrest or attempted to evade arrest by flight; and,

(4)   any other relevant factors such as exigent circumstances.

Estate of Diaz v. City of Anaheim, 840 F.3d 592, 605 (9th Cir. 2016); Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).

Courts may also consider, when appropriate, whether a warning was given before force was used. Deorle v. Rutherford, 272 F.3d 1272, 1283-84 (9th Cir. 2001).

### (1)   Severity Of The Crime At Issue

Crimes that carry an inherent risk of violence support an officer's use of force. Lowry v. City of San Diego, 858 F.3d 1248, 1257 (9th Cir. 2017).

### a. First Calls To Police About Hyer's Erratic And Threatening Behavior At Approximately 6:00 P.M. on June 22, 2018

The undisputed facts demonstrate that the police had two separate encounters with Hyer on June 22, 2018, the first beginning at approximately 6:00 p.m.

At the time, Hyer was a 32-year-old male, who was approximately 5'8" inches tall and weighed 150 pounds. (Autopsy Report of Hyer by Dr. Christopher Happy at p. 3, attached as Ex. A to Def. City's CSF, ECF No. 125-9).

Hyer lived in a studio apartment located in the beach community of Haleiwa, Hawaii, on the North Shore of Oahu. (Jones Decl. at ¶ 5, ECF No. 127-7). The studio Hyer rented was part of a two-story dwelling that was separated into several rental units. (Id.) Hyer's studio was located in the back of the dwelling, and it could only be entered from a sliding glass door that opened onto a small, wooden deck. (Honolulu Police Dep't Report, attached as Ex. 19 to Pl.'s Opp., ECF No. 140-23; Diagram, attached as Ex. 20 to Pl.'s Opp, ECF No. 140-24). The deck overlooked a small yard that was surrounded by trees, a chain link fence, and tall walls of brush. (Id.; Honolulu Police Report 18-236857, by Aaron Oshiro, attached as Ex. 10 to Pl.'s Opp., ECF No. 140-14).

The studio consisted of one large room and a bathroom. (Diagram, attached as Ex. 20 to Pl.'s Opp, ECF No. 140-24). There were only three places where it was possible to see into

the studio from the outside of the dwelling: a small window in the bathroom, a plexiglass picture window in the main room, and the sliding glass door into the main room.  (Id.)  The sliding glass door was the only entrance or exit to the studio.  (Id.)

Initial calls to police, around 5:53 p.m., stated Hyer was "out of control."  (Honolulu Police Report 18-236857, by Frances L. Bolibol, attached as Ex. 6 to Pl.'s Opp., ECF No. 140-10).  Patrol Officers Frances Bolibol and Stephen Keough arrived and reported that they met with Hyer, who was agitated, and that he had been ripping screens in the house.  (Id.)  The patrol officers determined that the confrontation between Hyer and other tenants in the rental house had abated, and they left the scene.  (Id.; Jones Decl. at ¶ 9, ECF No. 127-7).

**b.   Second Calls To Police About Hyer's Erratic And Threatening Behavior At Approximately 8:00 P.M. on June 22, 2018**

Approximately two hours after the first calls to the police, at around 8:00 p.m., there were a series of calls about Hyer's irrational, threatening, and criminal actions.  (Jones Dec. at ¶ 10, ECF No. 127-7).

The calls came from co-tenants of the rental house where Hyer rented his studio.  They stated that after the police left the first time, "Hyer continued to threaten them."  (Id. at ¶ 26).  One tenant reported that Hyer attempted to break into his bedroom.  (Id. at ¶ 27).  It was also reported that Hyer made

threats against the tenants and climbed "into a kitchen window in an area of the house that was not part of Hyer's apartment." (Id. at ¶ 25).

When Patrol Officers Bolibol and Keough returned to the scene, they found "Hyer was considerably more agitated than the first visit.  Hyer was pacing his residence, yelling out of the window about Satan and dead people in the walls of his apartment. He was threatening to 'kick his neighbor's ass.'" (Honolulu Police Report 18-236857, by Frances L. Bolibol, attached as Ex. 6 to Pl.'s Opp., ECF No. 140-10).  Officer Bolibol asked Hyer to calm down.  Hyer did not comply.  (Id.)

### c.   There Was Probable Cause To Arrest Hyer

Based on the undisputed facts, it is clear that the patrol officers at the scene had probable cause to arrest Hyer for burglary, terroristic threatening, and harassment pursuant to Haw. Rev. Stat. §§ 708-810, 708-811, 707-715, 707-1106.  See Graham, 490 U.S. at 396-97 (explaining that probable cause exists when, under all of the circumstances known to the officers at the time, an objectively reasonable officer would conclude that there is a fair probability that the suspect committed or was committing a crime).

The Ninth Circuit Court of Appeals has explained that both burglary and attempted burglary carry an inherent risk of violence.  Sandoval v. Las Vegas Metro. Police Dep't, 756 F.3d

1154, 1163 (9th Cir. 2014).  In the context of evaluating the
Graham factors for use of force, the crimes for which the
officers had probable cause to arrest Hyer included crimes with
an inherent risk of violence.  The severity of the crimes at
issue here weighs in favor of the use of force.  Lowry, 858 F.3d
at 1257.

> ### d.   Officers Were Required To Detain Hyer For A
> ###      Mental Health Evaluation

After Patrol Officer Bolibol met with Hyer following the
second encounter around 8:00 p.m., she believed that Hyer was in
need of immediate psychological or medical attention.  (Honolulu
Police Report 18-236857, by Frances L. Bolibol, attached as Ex. 6
to Pl.'s Opp., ECF No. 140-10; Application by Police Office for
Emergency Examination & Treatment, attached as Ex. 7 to Pl.'s
Opp., ECF No. 140-11).  Officer Bolibol contacted police
psychologist Dr. Vincent Tsushima and reported her observations.
(Id.)  Dr. Tsushima ordered the officers to take Hyer into
protective custody for a mental health evaluation ("MH1") because
Dr. Tsushima determined that Hyer was an imminent danger to
himself and/or others.  (Jones Decl. at ¶ 13, ECF No. 127-7).

Pursuant to Hawaii Revised Statutes § 334-59(a)(1), if a law
enforcement officer has reason to believe that a person is
imminently dangerous to self or others, the officer shall call
for assistance from the mental health emergency worker as
designated.  The statute provides, as follows:

> Upon determination by the mental health emergency
> workers that the person is imminently dangerous to self
> or others, the person **shall** be transported by ambulance
> or other suitable means, to a licensed psychiatric
> facility for further evaluation and possible emergency
> hospitalization.  A law enforcement officer may also
> take into custody and transport to any facility
> designated by the director any person threatening or
> attempting suicide.

Haw. Rev. Stat. § 334-59(a)(1) (emphasis added).

The officers were required to contact Dr. Tsushima pursuant to Section 334-59(a)(1).  Pursuant to the statute, Dr. Tsushima determined that Hyer was an imminent danger to himself and others.  (Jones Decl. at ¶ 13, ECF No. 127-7).  Following Dr. Tsushima's determination that Hyer was imminently dangerous to himself and others, Section 334-59(a)(1) of the Hawaii Revised Statutes required Hyer be taken into custody and transported to a psychiatric facility.  Haw. Rev. Stat. § 334-59(a)(1).

Plaintiffs do not dispute that the detention of Hyer for a mental health evaluation was necessary and required pursuant to Haw. Rev. Stat. § 334-59(a)(1).

The need to detain Hyer for a mental health evaluation was separate and apart from the probable cause to arrest Hyer for the crimes of burglary, terroristic threatening, and harassment. (Jones Decl. at ¶ 23, ECF No. 127-7).  Probable cause to detain a person for a mental health or psychiatric evaluation supports the use of force where, as here, the suspect was combative, suicidal, and posed a threat to himself or others.  Bias v. Moynihan, 508 F.3d 1212, 1220 (9th Cir. 2007) (finding no Fourth Amendment

violation where officers had to use physical force to detain a
person for a psychiatric evaluation pursuant to Cal. Welf. &
Inst. Code § 5150 where the suspect was combative and suicidal).

### (2)   Immediate Threat To Safety Of Officers Or Others

Evaluating the threat to the safety of the officers or
others is the most important factor to consider in situations
involving the use of deadly force by police.  Vos v. City of
Newport Beach, 892 F.3d 1024, 1031-32 (9th Cir. 2018).  In deadly
force cases, where the suspect poses no immediate threat to the
officer and no threat to others, the harm resulting from failing
to apprehend him does not justify the use of deadly force.  Glenn
v. Washington Cnty., 673 F.3d 864, 879 (9th Cir. 2011).  An
officer is justified in using deadly force, however, where a
suspect threatens an officer with a weapon such as a gun or a
knife.  Smith, 394 F.3d at 704-07.

The question of immediacy requires examining the totality of
the circumstances surrounding the threat to the officers.
Deorle, 272 F.3d at 1281.  If a suspect is armed or reasonably
suspected of being armed, "a furtive movement, harrowing gesture,
or serious verbal threat might create an immediate threat."
George v. Morris, 736 F.3d 829, 838 (9th Cir. 2013).  The
immediacy of the threat must be judged from the perspective of a
reasonable officer on the scene, "rather than with the 20/20
vision of hindsight."  Boyd v. Benton Cty., 374 F.3d 773, 779

(9th Cir. 2004).

The Ninth Circuit Court of Appeals has explained that it is "unquestionably reasonable" for police to shoot a suspect who police believe to be armed "if he reaches for a gun in his waistband, or even if he reaches there for some other reason." Cruz v. City of Anaheim, 765 F.3d 1076, 1078 (9th Cir. 2014). "[T]he police would doubtless be justified in responding to such a threatening gesture by opening fire" where the suspect had displayed "dangerous and erratic behavior." Id. A police officer may fire at a suspect when there is a reasonable basis to believe the suspect will soon access or use a weapon. Peck v. Montoya, 51 F.4th 877, 888 (9th Cir. 2022) (citing Cruz, 765 F.3d at 1077-78).

### a. Hyer Was Suicidal, Threatened Neighbors, And Brandished A Knife At Officers

Upon receiving the orders to take Hyer to Castle Medical Center for a mental health evaluation, patrol officers approached Hyer's residence to speak with him.  (Honolulu Police Report 18-236857, by Frances L. Bolibol, at p. 2, attached as Ex. 6 to Pl.'s Opp., ECF No. 140-10).  Officers were required to comply with Dr. Tsushima's order to detain Hyer.  Haw. Rev. Stat. § 334-59(a)(1).

The situation affected the neighbors who were renting other units within the dwelling.  They could not return to their units while Hyer was agitated, threatening, and attempting to break

into their units.  (Nobriga Decl. at ¶¶ 7-8, 10, ECF No. 127-3).

The officers arrived at the scene after the second calls at

around 8:00 p.m.  They were not successful in calming Hyer down

or taking him into custody.  It was now approximately 8:45 p.m.

(Honolulu Police Report 18-236857, by Frances L. Bolibol, at p.

1, attached as Ex. 6 to Pl.'s Opp., ECF No. 140-10).

The patrol officers called for Hyer to come out of his

studio, and he stepped out onto the deck.  (Id. at p. 2).  Hyer

was instructed to open the gate to the deck, but he refused.

(Id.)  Officer Bolibol asked Hyer several times to comply.  (Id.)

Hyer continued to refuse and his tone of voice became more angry.

(Id.)  Hyer repeatedly said the officers were disrespecting him,

and he said he was not going anywhere.  (Id.)

Officers tried to enter the gate to the deck but Hyer told

the officers to leave.  (Id.)  In response, Hyer ran inside his

studio and locked the sliding glass door.  (Id.)  Moments later,

Hyer returned to the door brandishing a knife.  (Id.)  Hyer said,

"go ahead just 'kill me' as he pounded his chest."  (Id.)  Hyer

then opened the sliding glass door about a foot wide.  (Id.)

Officers instructed Hyer to drop the knife several times but he

did not comply.  (Id.)

Following Hyer's refusal to drop his weapon, at about 9:15

p.m., Officer Bolibol deployed her Taser.  (Id.)  Hyer fell

backwards but quickly got up and locked the sliding glass door.

(Id.)  One of the prongs from the Taser could be seen in Hyer's

upper torso area, but the use of the Taser did not immobilize Hyer for a long enough duration to allow for officers to detain him.  (Id.)  Hyer was now yelling, babbling, and not everything he said could be understood.  (Id.)  Officers observed Hyer pacing back and forth and pounding on the glass door with the knife in his right hand.  (Id.)

### b.   Around 11:30 p.m., Officers From The Specialized Services Division Arrived

At approximately 9:30 p.m., Lieutenant Darin Evangelista, who was on the scene, called Major Darren Chun with the Specialized Services Division of the Honolulu Police Department. (Chun Decl. at ¶ 4, ECF No. 125-6).  Lieutenant Evangelista informed Major Chun about the situation with Hyer, stating that he was a "suicidal male armed with a knife that barricaded himself in an apartment located in Haleiwa."  (Id.)  Major Chun also heard an announcement on the police radio regarding Hyer that he "would not surrender to police and was lying in his bed armed with multiple knives and a bow and arrow."  (Id. at ¶ 8). Major Chun decided it was necessary to notify the Specialized Services Division Officers about the situation and "deemed it a 'callout' where available officers responded to the scene considering it a critical incident."  (Id.)

Major Chun arrived at the staging area and Specialized Services Division command post at approximately 11:30 p.m.  (Chun Decl. at ¶ 9, ECF No, 127-6).

32

Major Chun also notified the Crisis Negotiation Team ("CNT") at the same time as the callout notification. (Honolulu Police Report 18-236857, by Darren Chun, attached as Ex. 4 to Pl.'s Opp., at p. 3, ECF No. 140-8). Lieutenant Mark Matsusaka, Detective Napela Gay, Detective Michael Burger, and Detective Chris Kim responded to the staging area. (Chun Decl. at ¶ 29, ECF No. 127-6). The Crisis Negotiation Team members and Major Chun conferred, and they agreed not to use the CNT due to Hyer's uncooperativeness and refusal to communicate with officers. (Id. at ¶¶ 29-30).

There were no other means to communicate with Hyer because they did not have a phone number for him to call. (Honolulu Police Report 18-236857, by Darren Chun, attached as Ex. 4 to Pl.'s Opp., at p. 1, ECF No. 140-8). Major Chun declined to attempt to use a throw phone due to Hyer's uncooperativeness to communicate with officers, his aggressiveness while being armed, and the risk to officers that would be required to relay a throw phone to Hyer. (Id.)

Along the side of Hyer's residence was a high chain link fence and shrubbery just a few feet away from the dwelling. (Honolulu Police Report 18-236857, by Aaron Oshiro, attached as Ex. 10 to Pl.'s Opp., ECF No. 140-14). Officers set up a perimeter to secure the area around the residence and protect the neighborhood. (Chun Decl. at ¶¶ 9, 14, ECF No. 127-6).

Two divisions of the officers were established at the scene:

(1) a Perimeter Team, and (2) a React Team, which was set up in front of Hyer's studio as a tactical unit. (Id. at ¶¶ 12-16). The Perimeter Team proceeded to relieve the patrol officers that were surrounding Hyer's residence. (Id.) The React Team proceeded to take a place near the front of the residence in order to be prepared if it was necessary to go in. (Id.)

### c.   Defendant Individual Police Officers

The three Defendant Individual Police Officers were each members of the React Team:

**<u>Defendant Nobriga</u>**

Defendant Paul V. Nobriga was a Sergeant with the Honolulu Police Department ("HPD") at the time of the encounter with Hyer. He was assigned to the Special Services Division and had been employed by the HPD for more than 30 years. (Nobriga Decl. at ¶¶ 2-3, ECF No. 127-3).

Defendant Nobriga was assigned to lead the React Team of officers at the scene. (Id. at ¶ 17). Defendant Nobriga was supervised by Division Commander Major Darren Chun. (Id. at ¶ 4).

As React Team Leader, Defendant Nobriga supervised co-Defendants Wayne Silva and Malo Torres along with Officers Jared Nomura, Sean Cavaco, John Otto, Quentin Apilando, Dave Poltisch, Lyle Castro, and Robbie Robinson. (Id. at ¶ 17).

34

**Defendant Silva**

Defendant Wayne Silva was a Corporal with the Honolulu Police Department at the time of the encounter with Hyer.  (Silva Decl. at ¶¶ 2-3, ECF No. 127-2).  He was assigned to the Special Services Division and had been employed by the Honolulu Police Department for more than 27 years.  (Id.)  Defendant Silva was the handler for the police dog "Zero" and was assigned to the React Team as a tactical member.  (Id. at ¶ 8).

**Defendant Torres**

Defendant Malo B. Torres was also a Corporal with the Honolulu Police Department at the time of the encounter with Hyer.  (Torres Decl. at ¶¶ 2-3, ECF No. 127-1).  He was assigned to the Special Services Division and had been a police officer for more than 26 years.  (Id.)

Defendant Torres was assigned to the React Team and followed Defendant Silva and the dog Zero into the studio where Hyer had barricaded himself.  (Id. at ¶¶ 4, 17-20; HPD Records for 18-236857, listing Personnel Involved, attached as Ex. 11 to Pl.'s CSF in Opp., ECF No. 140-15).

> d.   **At 12:41 a.m., The React Team Again Tried To Communicate With Hyer Who Was Barricaded Inside The Studio**

After the Taser was unsuccessful and the patrol officers were unable detain him, Hyer closed his curtains.  (Nobriga Decl.

at ¶ 20, ECF No. 127-3).  The closed curtains prevented the officers from seeing into Hyer's studio, or what weapons he possessed.  (Id.)  Officer Nobriga observed that the area fronting Hyer's residence was completely dark.  (Id. at ¶ 19).  There appeared to be a television on within the studio, shining light through small openings in the completely closed curtains.  (Id. at ¶ 20).

At approximately 12:41 a.m., on June 23, 2018, Sergeant Nobriga set up lights around the studio and continued trying to communicate with Hyer.  (Chun Decl. at ¶¶ 18-21, ECF No. 127-6).  Sergeant Nobriga observed the deck light turned on by Hyer and could hear movement inside Hyer's bathroom.  (Nobriga Decl. at ¶ 21, ECF No. 127-3).  Sergeant Nobriga made announcements to Hyer such as, "this is the police, we are outside, come out and talk to us.  Let's see how we can resolve this."  (Id. at ¶ 22).  Sergeant Nobriga spoke to Hyer in a calm, normal voice and in a normal tone.  (Id. at ¶ 23).  He asked Hyer to exit the studio.  (Id. at ¶ 25).

Hyer moved the curtain and became visible to officers.  (Id. at ¶ 27).  Hyer gave the officers the middle finger and then took out a camera with a large lens up against the glass and appeared to take photos.  (Id. at ¶¶ 25-28, 30; Chun Decl. at ¶ 22, ECF No. 127-6).

Sergeant Nobriga continued to ask Hyer to exit the studio and told him he would be safe if he came out, but Hyer again

stuck out his middle finger and refused to exit.  (Nobriga Decl. at ¶¶ 30-31, ECF No. 127-3).  Hyer ignored the continued requests for him to peacefully exit the studio.  (Id.)

### e.  At 1:15 a.m., The React Team Breached Hyer's Bathroom Window

Because of Hyer's refusal to surrender, Major Chun and Sergeant Nobriga made the decision to breach the window to Hyer's bathroom.  (Nobriga Decl. at ¶ 32, ECF No. 127-3).  Sergeant Nobriga explained that some escalation was necessary because the Taser had already been used and was ineffective.  The attempts to open a dialogue and communicate by both patrol officers and SSD officers had failed.  (Id. at ¶ 34).  The window breach was the next less than lethal force option that would allow officers to get a view into the unit and would also deny Hyer access to the bathroom and its water source, should they deploy chemical munitions.  (Id.)

At approximately 1:15 a.m, React Team officers breached the window to Hyer's bathroom, but Hyer moved large furniture and barricaded himself inside the studio to block the sight lines and that entry to his studio.  (Chun Decl. at ¶¶ 25-27, ECF No. 127-6; Nomura Decl. at ¶ 15, ECF No. 127-5; Nobriga Decl. at ¶ 35, ECF No. 127-3).

Hyer could be heard yelling within the unit, sounding extremely agitated.  (Nobriga Decl. at ¶ 36, ECF No. 127-3).  Sergeant Nobriga wanted additional cover for the officers and a

clearer view of the front of the sliding glass door because of Hyer's agitated demeanor and access to dangerous weapons.  (<u>Id.</u> at ¶ 37).

Sergeant Nobriga instructed officers to utilize power saws and cut several of the tall trees that separate the property from the lane behind the residence.  (<u>Id.</u> at ¶ 38).  This was done in order to move a BearCat armored vehicle into the newly created opening in the trees.  (<u>Id.</u>)  Sergeant Nobriga explained that the opening would create a safe location and allow a better view for officers to see inside the unit.  (<u>Id.</u>)

Hyer's studio was on a raised foundation and the door and windows were in an elevated position, placing Hyer on higher ground than the officers.  (Honolulu Police Report 18-236857, by Aaron Oshiro, attached as Ex. 10 to Pl.'s Opp., ECF No. 140-14).

Sergeant Nobriga positioned the BearCat armored vehicle in the opening.  (<u>Id.</u> at ¶ 39).  Sergeant Nobriga and the driver of the BearCat made requests to Hyer to surrender.  (<u>Id.</u> at ¶¶ 40-41).  Hyer could be heard yelling from within the unit but officers could not make out what Hyer said.  (<u>Id.</u> at ¶ 42).

### f.   Hyer Pointed A Compound Bow At Officers

The Perimeter Team Officers reported that Hyer approached the sliding glass door, opened the door, and pointed a compound bow with an arrow at officers.  (Nomura Decl. at ¶ 15, ECF No. 127-5).  The range of the compound bow was farther than the

length and width of the yard at the residence, allowing Hyer to shoot any officer within the perimeter or into the surrounding residential area.  (Nobriga Decl. at ¶ 13, ECF No. 127-3; Silva Decl. at ¶ 5, ECF No. 127-2).

At the time, React Team officers were not clear if Hyer had a cross bow or a compound bow, but both types of weapons are similarly powerful and are designed for hunting.  (Nobriga Decl. at ¶ 12, ECF No. 127-3).  It was later determined that Hyer was in possession of a compound bow.  (Nobriga Depo. at pp. 133-34, ECF No. 171-2; Photograph of Compound Bow, attached as Ex. 15 to Pl.'s Sur-Reply, ECF No. 171-16).

According to officers, a compound bow has a long range and the "arrows can go through walls and go clean through an animal." (Declaration of Wayne K. Silva ("Silva Decl.") at ¶ 5, attached to Def. Officers' CSF, ECF No. 127-2).  The officers were concerned for their safety.  (Id.)  The officers also feared that, "even with a perimeter in place, there is the possibility that an arrow can be shot into the surrounding residential area in Haleiwa, where homes are close together."  (Id.)

> ### g.  Chemical Munitions Deployed At Approximately 2:20 a.m.

The police officers' verbal requests for Hyer to peacefully leave the studio were unsuccessful.  Hyer responded by giving officers the middle finger and brandishing a compound bow. (Honolulu Police Report 18-236857, by Paul V. Nobriga, at p. 2,

ECF No. 140-16).

Officers decided to deploy chemical munitions in an attempt to flush Hyer from the studio. (Nomura Decl. at ¶¶ 17-19, ECF No. 127-5). Sergeant Nobriga explained that chemical munitions were the next less than lethal option at that point. (Nobriga Decl. at ¶ 44, ECF No. 127-3). Chemical munitions cause discomfort but do not cause lasting physical injury and can be effective in preventing direct combat where the suspect, such as Hyer, is armed with dangerous weapons. (Id.)

At approximately 2:20 a.m., officers attempted to launch chemical munitions through the plexiglass picture window but it did not break. (Nobriga Decl. at ¶¶ 45-46, ECF No. 127-3; Chun Decl. at ¶ 41, ECF No. 127-6). The only other available entrance was the sliding glass door. (Id.) The officers used a rock to shatter the sliding glass door, in an effort to flush Hyer out. (Nobriga Decl. at ¶¶ 46-49, ECF No. 127-3).

The use of chemical munitions was intended to cause Hyer to leave the studio so that officers could detain him and take him for a mental health evaluation. Officers explained that a normal reaction to the gas "is for the person to gasp, cough, run out of the house," but Hyer did not leave the studio. (Nomura Decl. at ¶ 21, ECF No. 127-5).

Hyer responded to the chemical munitions by becoming "enraged and began to swear and challenge [the] officers while using what appeared to be a stick to breach the surrounding glass

that was still hanging around the entrance door." (Id. at ¶ 22).
"Hyer was also seen kicking out the screen sliding door off of
the track onto the front porch." (Id. at ¶ 23).

It was after the demolishing of the glass and screen that,
for a second time, Perimeter Team officers observed Hyer at the
door. He brandished the compound bow and pointed it out toward
the officers. (Id. at ¶ 24; Deposition of Wayne Silva ("Silva
Depo.") at pp. 119-20, attached to Pl.'s Sur-Reply, ECF No. 171-
8).

### h. The Police Dog Is Deployed, The Officers Enter The Studio Following The Police Dog

Because Hyer refused to surrender and was now seen near the
sliding glass door opening armed with the compound bow, Major
Chun and Sergeant Nobriga conferred about the next options and
decided to deploy the police dog to attempt to control Hyer
before he retreated back into the residence and out of sight.
(Nobriga Decl. at ¶ 53, ECF No. 127-3).

The officers conferred with Corporal Silva who was the
police dog Zero's handler. (Id.) Deployment of a police dog is
a less than lethal force option that typically minimizes risk of
injury to officers, because when suspects are informed that a
police dog will be deployed they are often motivated to come out
and surrender. (Id. at ¶ 54).

Corporal Silva agreed with the decision to utilize the
police dog. (Silva Decl. at ¶ 23-25, ECF No. 127-2). Hyer had

demonstrated increasingly violent, hostile, aggressive, and erratic behavior.  Hyer's aggressive actions, his imminent threat to himself and others, and his specific threats to officers with dangerous weapons required the increased level of force by the officers.  (Id.)

React Team Officers had to consider that other weapons may have been available to Hyer in his studio, but they did not know exactly which weapons Hyer may have had.  (Deposition of Malo B. Torres, ("Torres Depo.") at p. 167, attached to Def.'s Response to Pl.'s Sur-Reply, ECF No. 174-4).  The inside of the studio was not visible despite the floodlights used by the Perimeter Team. (Id. at p. 155).

Corporal Silva and the other React Team members were dressed in official SWAT uniforms with vests labeled "Police."  (Silva Decl. at ¶¶ 9-10, ECF No. 127-2).

Hyer stood in the doorway of the studio leaning out and yelled profanities at officers.  (Nomura Decl. at ¶ 27, ECF No. 27; Declaration of John Otto ("Otto Decl.") at ¶¶ 17-18, ECF No. 127-4; Silva Decl. at ¶ 27, ECF No. 127-2).  Corporal Silva announced to Hyer, "This is the Police, give yourself up now or I'm sending in my dog and he will bite!"  (Silva Decl. at ¶ 26, ECF No. 127-2).

Sergeant Nobriga instructed Officers Nomura, Torres, Otto, Politsch, and Silva to move forward in anticipation of the dog contacting Hyer.  (Nobriga Decl. at ¶ 59, ECF No. 127-3).

Corporal Silva deployed Zero.  (Id.)  The dog ran into the doorway as the team followed and Hyer retreated into the studio. (Id. at ¶ 60; Nomura Decl. at ¶ 29, ECF No. 127-5; Otto Decl. at ¶¶ 19-20, ECF No. 127-4; Silva Decl. at ¶¶ 28-29, ECF No. 127-2; Torres Decl. at ¶ 20-21, ECF No. 127-1).

### i.   Hyer Stabs The Dog With The Arrow

Inside the studio, Hyer was striking Zero with the compound bow and stabbing Zero with an arrow.  (Torres Decl. at ¶ 21, ECF No. 127-1; Nomura Decl. at ¶¶ 32-33, ECF No. 127-5; Silva Decl. at ¶¶ 30-32, ECF No. 127-2; Otto Decl. at ¶ 22, ECF No. 127-4).

Officer Otto was at the back of the officers who entered and he moved to cover the right flank as there was an uncleared closet[1] and door at the right side rear of the studio.  (Otto Decl. at ¶ 21, ECF No. 127-4).  Officer Otto's job was to search for secondary or tertiary threats, and he was splitting his attention between the uncleared portion of the room and what Hyer was doing, but he did see Hyer stabbing the police dog with the arrow.  (Id. at ¶ 22).

Officers instructed Hyer to put down the compound bow and the arrow, but Hyer did not.  Hyer kept swinging his bow and stabbing Zero with the sharp-pointed arrow.  (Torres Decl. at ¶¶

---

[1] The closet is identified as a "pantry" with a door in the diagram.  (Honolulu Police Department Diagram, attached as Ex. 20 to Pl.'s Opp., ECF No. 140-24; Jones Decl. at ¶¶ 3, 5-6, 12, ECF No. 127-7).

22-23, ECF No. 127-1).  Corporal Torres observed "Hyer's arrow connect with Zero's head area about two to three times."  (Id. at ¶ 24).

### j.   The Slashing Of The Arrow At The Officers

Corporal Torres feared for his safety given Hyer's violent reaction stabbing the police dog, explaining "[w]hile at some point it crossed my mind to go hands on and/or tackle Hyer, I ultimately did not do this because I had seen what he had done to Zero with the arrow, and it would be too dangerous and would expose myself to the likely possibility of being stabbed by Hyer with the arrow."  (Id. at ¶ 25).

Corporal Torres again ordered Hyer to put down his weapons, but Hyer did not comply.  (Id. at ¶ 26).

Corporal Torres and Officer Nomura moved "to approximately four to six feet away from [Hyer]."  (Id. at ¶ 27).  At the same time, Corporal Silva moved in to grab Zero who had taken multiple stabs to the head.[2]  (Id. at ¶ 28; Silva Decl. at ¶ 33, ECF No. 127-2).

As Zero was taken by Corporal Silva, Hyer swung an arrow in a horizontal slashing motion at Officer Nomura, Corporal Torres, and Corporal Silva.  (Nomura Decl. at ¶¶ 36-37, ECF No. 127-5; Torres Decl. at ¶ 30, ECF No. 127-1).  Hyer's swing of the arrow

---

[2] Following the stabbing by Hyer, Police K-9 Zero was transported to the VCA Animal Hospital where he underwent surgery and was treated for three stab wounds.  (Chun Decl. at ¶¶ 56-57, ECF No. 127-6; Silva Decl. at ¶ 35, EF No. 127-2).

"nearly miss[ed]" Officer Nomura, Corporal Torres, and Corporal Silva who was handling the injured Zero.  (Torres Decl. at ¶ 30, ECF No. 127-1; Torres Depo. at p. 192, ECF No. 171-10).

### k.    Hyer Brandished The Compound Bow At The Officers While Loading It

After Hyer swung the arrow at the officers, Officer Nomura and Corporal Torres observed that Hyer "began to load the arrow into the bow."  (Nomura Decl. at ¶ 36, ECF No. 127-5; see Torres Decl. at ¶ 31, ECF No. 127-1).

Officer Nomura explained that he observed Hyer begin to load the compound bow and raise the arrow in their direction, and "[a]t this point, due to the proximity of Hyer being within seven feet and the injuries I observed the arrow caused to [the police dog] Zero, I believed that my life and my partners' lives were in imminent danger of serious bodily injury or death....I began to engage my sights of my department issued firearm with the intent to discharge my weapon."  (Nomura Decl. at ¶¶ 37-38, ECF No. 127-5).

Officer Nomura gave verbal commands for Hyer to drop the weapon multiple times and yelled "Don't do it! Drop it!" as Hyer attempted to load the arrow into the bow.  (Id. at ¶ 34; Otto Decl. at ¶¶ 23-25, ECF No. 127-4).

Corporal Torres testified that he also saw Hyer attempting to load the bow and point the arrow at them, and "that's where even with the constant pleading with him to drop it, he points it

45

in our area, brings it up." (Torres Depo. at p. 167, ECF No. 174-4).

Corporal Torres stated, he "feared that [Hyer] was going to shoot the arrow at me and my fellow officers in the room, causing us serious injury or death." (Torres Decl. at ¶ 34, ECF No. 127-1). Corporal Torres explained that given Hyer's actions, he was "certain" "that Hyer was about to shoot the compound bow toward us." (Id. at ¶ 41). Corporal Torres testified in his deposition, as follows:

> And as we move close to myself and Officer Nomura moves closer, that's when Mr. Hyer kind of lunges at us with the arrow and kind of swipes at us, the three of us in that area that's moving around...So when he slashes, he says, "fuck you guys," and then the bow is in his left hand and he drops it. I'm trying to get him to focus on me and not [Corporal] Wayne [Silva] and Zero. And he puts the arrow on top of the compound bow or the bow which is kind of upward. After he slashes, we duck, we kind of bounce back, and he drops it. And I see is like about to make that motion to pull it back or he's starting and that's where even with the constant pleading with him to drop it, he points it in our area, brings it up, and that's when I released the three rounds, squeezed the trigger with three consecutive rounds.

(Torres Depo. at p. 167, ECF No. 174-4).

Corporal Torres fired three rounds in succession, causing Hyer to immediately drop the compound bow and arrow. (Id.)

### 1.   There Was An Immediate Threat To The Officers At The Time Of The Use Of Deadly Force

The undisputed facts demonstrate that Hyer posed an immediate threat to the officers at the time of the shooting.

46

Hyer had previously threatened neighbors, attempted to break into their units, wielded deadly weapons, threatened officers, and was deemed suicidal and a threat to himself and others.

The undisputed facts demonstrate that after officers deployed the dog and moved in to try to detain Hyer, Hyer stabbed the dog and swung the sharply-pointed arrow at the officers. Hyer then brandished the compound bow and as he loaded the arrow in order to shoot at the officers.

### i.  Plaintiffs Attempt To Rely On Argument Rather Than Evidence To Dispute Facts

Plaintiffs were given three opportunities to file a concise statement of facts in opposition to Defendants' Motions for Summary Judgment.  The Court struck the first opposition by Plaintiffs because, as the Court pointed out to Plaintiffs, they failed to file evidence to dispute the facts set forth by the Defendants.  The Court explained that Plaintiffs may not rely solely on argument to dispute facts.

In the second filing, Plaintiffs still failed to present evidence to create a genuine issue of material fact.  Plaintiffs failed to respond to a number of the facts presented in Defendants' concise statement of facts.

Following additional discovery, the Court provided Plaintiffs with a third attempt to present evidence to create a genuine issue of material fact.  Plaintiffs have failed to do so. Rather than rely on facts to demonstrate a Constitutional

violation, Plaintiffs attempt to rely on policies of the Honolulu
Police Department, alternative methods that Plaintiffs wished the
Officers would have employed, and arguments not based on
evidence.

Plaintiffs cite to the Officers' Declarations, Depositions,
and Police Reports, but a review of the records demonstrates that
they are consistent with the other evidence in the record and the
officers' version of events.

Plaintiffs general assertions that Hyer was not an immediate
threat to the officers is belied by the record and without
evidentiary support.  Ochoa v. Cty. of Mesa, 26 F.4th 1050, 1058
(9th Cir. 2022) (finding plaintiffs' assertions that the officers
engaged in excessive force without evidentiary support did not
create a dispute of fact).

### ii.  Plaintiffs Rely On Erroneous Legal Theories

Plaintiffs' suggestion that the officers created the
exigency that led to the shooting is both legally and factually
incorrect.  Plaintiffs' position ignores the undisputed factual
evidence of Hyer's violence, threats, suicidal behavior, and use
of and access to deadly weapons.  See Ochoa, 26 F.4th at 1058.  A
lawful action by police is not rendered unreasonable because it
provokes a violent reaction.  Cty. and Cnty. of San Francisco v.
Sheehan, 575 U.S. 600, 615 (2015).  The United States Supreme
Court has specifically rejected the "provocation rule" theory

48

upon which Plaintiffs rely as set forth in <u>County of Los Angeles</u> <u>v. Mendez</u>, 581 U.S. 420, 421 (2017).

Plaintiffs' arguments that they wished police officers had called Hyer's father or used different tactics also do not alter the analysis.  The Ninth Circuit Court of Appeals has clearly explained that even where officers have alternative means available, police officers need not avail themselves of the least intrusive means of responding but need only act within a range of reasonable conduct.  <u>Scott v. Henrich</u>, 39 F.3d 912, 915-16 (9th Cir. 1994).  Arguments based on what the officers could have done do not create a genuine dispute of material fact.  <u>Scott v.</u> <u>Harris</u>, 550 U.S. 372, 385 (2007).

### <u>iii.</u> Plaintiffs' Reliance On Expert Reports Does Not Create Genuine Issues Of Material Fact

Defendants attempt to rely on expert opinions that claim the officers' conduct was unreasonable.  These opinions do not create genuine disputes of material fact.  The United States Supreme Court has explained that a plaintiff cannot avoid summary judgment by simply producing an "expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate or even reckless, so long as a reasonable officer could have believed that his conduct was justified."  <u>Sheehan</u>, 575 U.S. at 616-17.

"A jury does not automatically get to second-guess these

49

life and death decisions, even though a plaintiff has an expert
and a plausible claim that the situation could better have been
handled differently." Id. (internal citations and quotations
omitted); see Lal v. Cal., 2012 WL 78674, *8 (N.D. Cal. Jan. 10,
2012) (finding opinions in plaintiffs' expert reports that
officers acted unreasonably in using deadly force failed to
create a genuine issue of material fact to defeat summary
judgment).

Here, Defendants City and County of Honolulu and the
Individual Officers object to the admission of the three expert
reports submitted by Plaintiffs in support of their Opposition to
Defendants' Motions for Summary Judgment.  Specifically,
Defendants object to the purported factual allegations contained
in the expert reports because the experts have no personal
knowledge of the events in this case and the allegations are not
supported by any other evidence in the record.

Defendants' objections are well-founded.  Plaintiffs' expert
reports contain allegations that are unsupported by evidence and
are not admissible.  It is well established that an expert cannot
render an opinion based on facts not in evidence. Gretzler v.
Stewart, 112 F.3d 992, 1003 (9th Cir. 1997).

For example, Plaintiffs cite to the report of A.E. Daniel
M.D. in their Concise Statement of Facts for the factual
assertion that officers called Hyer a "delinquent." (Pl.'s CSF
in Opp. at ¶ 4, ECF No. 140, citing to the Daniel Report at p. 5,

¶ 30, attached as Ex. 1 to Pl.'s CSF, ECF No. 140-5).  There is
no citation to evidence in the record to support the assertion in
the expert report.  Plaintiffs also cite to the Daniel's report
for other factual assertions in their CSF at ¶¶ 8-9, 12-13, 15-
21, 23, 30, 31-33 without a factual basis in the record.
Plaintiffs may not use an expert report to prove the existence of
facts.  Kaur v. City of Lodi, 263 F.Supp.3d 947, 976-78 (E.D.
Cal. 2017).

In addition, Plaintiffs improperly cite to the expert report
of Scott DeFoe for factual assertions that are not supported by
evidence in the record.  (See Pl.'s CSF at ¶¶ 8-9, 12, 21, 28,
and 34).

Plaintiffs also rely on the expert report of Kris Sperry.
Defendants object to the admissibility and reliability of the
report.  Expert testimony is inadmissible when it contains
improper legal conclusions, is based on facts not in evidence,
contradicts the evidence in the record, and lacks foundation.
Hooper v. Lockheed Martin Corp., 688 F.3d 1037, 1052 (9th Cir.
2012); Estate of Gonzales v. Hickman, 2007 WL 3237727, *3 n.34
(C.D. Cal. May 30, 2007).  Just as with Plaintiffs' other expert
reports, the Sperry report is not admissible.  The Sperry report
is not reliable, it provides no methodology for the opinions, is
speculative, contains improper legal conclusions, and lacks
foundation.

Defendants' objections to the admission of Plaintiffs'

expert reports are **SUSTAINED.**

### iv.  Even If Admissible, The Sperry Report Does Not Alter The Analysis

Plaintiffs claim that Hyer was not in the process of pointing the compound bow at officers at the time he was shot, but they have not presented any admissible evidence to support their claim.

The Court is mindful that Hyer cannot testify, and it carefully examined all of the evidence in the record to evaluate whether there are any genuine issues of material fact.  Gonzalez v. City of Anaheim, 747 F.3d 789, 795 (9th Cir. 2014). Plaintiffs have not provided any evidence to establish a genuine dispute of material fact for trial.

Plaintiffs rely on an expert report by Kris Sperry, M.D., to try to establish that Hyer was not pointing the compound bow at officers at the time of the shooting.  The expert report is not reliable.  It speculates as to Hyer's method of using the compound bow, and it assumes, with no factual basis, that Hyer made no movements in his body position as the three gun shots were fired.  In addition Sperry misconstrues Corporal Torres' statements in an attempt to discredit him.  Contrary to Sperry's misstatement of the evidence, Corporal Torres testified that he viewed Hyer as attempting to load the bow, making a motion to "pull it back or he's starting," explaining that it was "point[ed] in [the officers'] area," which is consistent with the

other undisputed facts in the record.  (Torres Depo. at p. 167, ECF No. 174-4).

Even if the Court credited the Sperry Report, the report does not create a genuine issue of material fact.  The Officers did not have to wait until Hyer fully loaded the arrow and pulled back the bow, or successfully shot them, before using deadly force.  The Ninth Circuit Court of Appeals has explained that an officer is "not required to wait and be seriously injured or killed before exercising his judgment and bringing the situation under control."  Monroe v. Cty. of Phoenix, 248 F.3d 851, 862 (9th Cir. 2001) (overruled on other grounds in Acosta v. Hill, 504 F.3d 1323 (9th Cir. 2007)).

Despite Plaintiffs' arguments to the contrary, the Officers' accounts of the events are consistent and the law does not require the officers to "divine such a biomechanical explanation as an incident unfolds in a matter of seconds."  Gonzales v. Cty. of Antioch, 2015 WL 6152781, *12 (N.D. Cal. Oct. 20, 2015) (citing George, 736 F.3d at 838).

Plaintiffs attempt to create disputes of fact based on omission, but a review of the record demonstrates there are no omissions that create a genuine dispute of material fact.  For example, Plaintiffs claim that Officers Silva and Otto did not state that Hyer was loading the arrow into the compound bow at the time of the shooting, asserting they "had a clear, unobstructed view of the final seconds prior to the shooting."

(Pl.'s Opp. at p. 11, ECF No. 139).

Plaintiffs misconstrue and misrepresent the evidence. Officer Otto stated in his Declaration that contrary to Plaintiffs' speculation, he did not have an "unobstructed view" of Hyer.  Officer Otto explained that it was his responsibility as a member of the React Team to protect the other officers' backs and search for secondary threats after entering the studio. (Otto Decl. at ¶ 21, ECF No. 127-4).  Officer Otto stated that he "was splitting [his] attention between the uncleared portion of the room and what Hyer was doing," and that his back was turned at the time of the shooting because he was focused on any threats from the other side of the studio.  (Id. at ¶¶ 22-24).

Corporal Silva explained that he also did not have an obstructed view of Hyer at the time of the shooting, because he was focused on the police dog Zero after he was stabbed by Hyer. (Silva Decl. at ¶¶ 32-34, ECF No. 127-2).  The record establishes that the Officers' Declarations are consistent with the police reports.  Plaintiffs have not pointed to a material dispute or provided any evidence to demonstrate a genuine dispute of material fact.

Under the tense, uncertain, and rapidly evolving circumstances, which transpired over the course of mere seconds from when the dog was deployed, the immediate threat to the safety of the officers supports the use of force in this case. Smith, 394 F.3d at 704; see Tennessee v. Garner, 471 U.S. 1, 11-

12 (1985).  The record demonstrates that although Corporal Torres was the only officer that shot Hyer, Officer Nomura also drew his firearm and prepared to shoot Hyer because Officer Nomura perceived Hyer as an immediate threat to him and other officers. (Nomura Decl. at ¶¶ 38-40, ECF No. 127-5).

The Ninth Circuit Court of Appeals has explained that when a suspect acts in a dangerous or erratic manner and there is "some reason to believe that the suspect will soon access or use the weapon" by reaching or a similar threatening gesture, "the police would doubtless be justified in responding to such a threatening gesture by opening fire."  Peck, 51 F.4th at 888 (citing Cruz, 765 F.3d at 1078).

The undisputed facts demonstrate that Hyer was an immediate threat to the officers at the time of the shooting.

### (3)  Resisting Or Evading Arrest

The third enumerated factor that plays a part in the Court's evaluation of the government's interest at stake is whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  Deorle, 272 F.3d at 1280.

Here, it is undisputed that Hyer fled from officers when they attempted to speak with him and place him in protective custody for a mental health evaluation.  (Honolulu Police Report 18-236857, by Frances L. Bolibol, attached as Ex. 6 to Pl.'s Opp., ECF No. 140-10).

Hyer ignored verbal commands from the officers and barricaded himself inside his studio apartment.  There can be no dispute that Hyer resisted and evaded detention by the officers. This factor supports the officers' use of force.  Seidner, 39 F.4th at 599-600 (explaining that flight and evading arrest increase the government's interest in the use of force); see Chang v. Cty. of Pacifica, 2018 WL 10460280, *8 (N.D. Cal. Mar. 30, 2018) (finding officer's use of deadly force was reasonable where mentally ill man barricaded himself in his home and refused to follow officers' commands and wielded a knife when officers attempted to detain him).

### (4)  Other Relevant Factors

The exigency of the circumstances, in addition to the other Graham factors, supports the officers' use of force.  There was urgency and exigent circumstances involved.  Tenants of the rental home were unable to return to their units due to Hyer's behavior that involved barricading himself inside the studio, threatening them, and attempting to break into their residences. Hyer continually brandished deadly weapons and threatened police officers.  The compound bow that Hyer brandished had a range that was beyond the scope of the perimeter the police could establish and could have caused serious injury to officers or others.

An evaluation of all of the Graham factors demonstrates that the Officers' use of force was objectively reasonable under the

56

circumstances.  The undisputed facts here establish that the officers had probable cause to arrest Hyer for burglary, terroristic threatening, and harassment.  The officers were instructed to detain Hyer for a mental health evaluation given his erratic and irrational behavior and the threat to himself and others.  The government interest in the use of force was high given the severity of the circumstances and crimes at issue.

Hyer fled from officers when they tried to detain him and he barricaded himself inside of the studio.  There is no dispute that officers attempted numerous actions using less than lethal force in an attempt to detain Hyer.  Hyer refused all of the officers' instructions and the lower levels of force were ineffective.  After Hyer brandished deadly weapons and threatened officers, officers gave verbal warnings and deployed a police dog.

It is undisputed that Hyer stabbed the dog and swung the arrow at the officers.  Hyer posed an immediate threat when he began to load the compound bow with the arrow.  Corporal Torres acted reasonably given the totality of the circumstances when he fired three shots at Hyer after giving verbal warnings.  A police officer may use deadly force when, as here, he reasonably believes that the suspect poses a threat of serious physical harm either to the officer or to others.  Blanford v. Sacramento Cnty., 406 F.3d 1110, 1118-19 (9th Cir. 2005); see also Gregory v. Cnty. of Maui, 523 F.3d 1103, 1109 (9th Cir. 2008).

It is undisputed that Hyer acted dangerously and erratically, possessed a deadly weapon, and made a threatening gesture by both stabbing the dog and swinging the arrow at the officers and then preparing to shoot the officers.  Caselaw in the Ninth Circuit Court of Appeals is clear that "the police would doubtless be justified in responding to such a threatening gesture by opening fire."  Cruz, 765 F.3d at 1078.

## III. Plaintiffs' Excessive Force Claims Against Sergeant Nobriga And Corporal Silva

Even if there were questions as to the use of deadly force, Sergeant Nobriga and Corporal Silva are not liable for force they did not use as they were not integral participants in the use of deadly force.

Defendant Nobriga, a Sergeant with over thirty years experience with the Honolulu Police Department, was the React Team Leader and a member of the Specialized Services Division.

Corporal Silva, with over 27 years experience with the Honolulu Police Department, was the handler for K-9 Officer "Zero" and deployed the dog.

There is no evidence that Defendants Nobriga or Silva participated in the shooting of Hyer.  Individual Officers may not be held liable for being bystanders or "team members" to unlawful acts of co-officers who commit them.  Varlitsky v. Cnty. of Riverside, 2022 WL 2189623, *5 (C.D. Cal. Jan. 7, 2022).  Imputing liability to law enforcement officers based solely on

their status as a co-officer has been rejected by the Ninth
Circuit Court of Appeals.  Chuman v. Wright, 76 F.3d 292, 295
(9th Cir. 1996); see Hopkins v. Bonvicino, 573 F.3d 752, 769-70
(9th Cir. 2009).

Law enforcement officers may, however, be liable under the
"integral participant" standard.  Liability pursuant to the
integral participant standard is limited to two situations:

(1)   those in which the defendant knew about and acquiesced
      in the constitutionally defective conduct as part of a
      common plan with those whose conduct constituted the
      violation; or,

(2)   those in which the defendant set in motion a series of
      acts by others which the defendants knew or reasonably
      should have known would cause others to inflict the
      [un]constitutional injury.

Peck, 51 F.4th at 891.

Simply being present at the scene does not demonstrate that
an officer has acted as part of a common plan.  Id. at 889.
Contributing to or facilitating a constitutional violation
requires more than simply but-for causation.  Id. at 890.
Liability may not be imposed based on a "team effort" theory that
would allow the jury to lump all the defendants together, rather
than require it to base each individual's liability on his own
conduct.  Id.  The official must have at least the same level of
intent as would be required if the official were directly to
deprive the victim of his constitutional rights.  Lacey v.
Maricopa Cnty., 693 F.3d 896, 916 (9th Cir. 2012).

In Peck v. Montoya, 51 F.4th 877, 882 (9th Cir. 2022), five

59

officers responded to a 911 call of a man behaving erratically and brandishing a weapon.  The officers established a perimeter around the house and observed the man screaming and acting agitated.  Id. at 883.  The man made obscene gestures toward the officers and yelled statements like, "kill me" and "if you come in my house, I'm going to shoot you."  Id.  The situation escalated and two of five officers opened fire and killed the man.  Id. at 882.

The Ninth Circuit Court of Appeals ruled that the three officers who did not shoot the man were entitled to qualified immunity.  Id. at 891.  The appellate court explained, "we easily conclude that [the three non-shooting officers] were not integral participants in [] the shooting....Perhaps it was foreseeable that a shooting might take place when the deputies arrived on the scene of a 911 call about an encounter in which an individual had brandished a weapon and was behaving erratically.  But [the non-shooting officers] had no reason to know that an *unconstitutional* shooting would take place."  Id.

Just as in Peck, there is no evidence that either Sergeant Nobriga or Corporal Silva was a integral participant in the shooting.  Sergeant Nobriga supervised the other officers, but there is no evidence that he directed any unconstitutional action or set actions in motion for an unconstitutional shooting to take place.  Plaintiffs have not provided any evidence to demonstrate that either Sergeant Nobriga or Corporal Silva participated in

any unconstitutional action.

The record demonstrates that Sergeant Nobriga and Corporal Silva were members of the React Team who attempted to detain Hyer pursuant to orders from the police psychologist.  There are no facts to establish that the actions of either Defendant Nobriga or Defendant Silva directly deprived Hyer of any constitutional rights.  Lacey, 693 F.3d at 916.  Neither the deployment of chemical munitions nor the deployment of the dog was unreasonable given the undisputed facts in the record.  See Medoza v. Block, 27 F.3d 1357, 1362 (9th Cir. 1994) (officers may deploy a dog on a suspect who is armed and has been warned that he will be bitten if he does not come out from hiding).  The use of chemical munitions was objectively reasonable.  Headwaters Forest Defense v. Cnty. of Humboldt, 276 F.3d 1125, 1130 (9th Cir. 2002) (explaining that the use of chemical munitions may be reasonable "to bring an arrestee under control" quoting LaLonde v. Cnty of Riverside, 204 F.3d 947, 961 (9th Cir. 2000)); Alford v. Humboldt Cnty., 785 F.Supp.2d 867, 876 (N.D. Cal. 2011) (finding use of chemical weapons was reasonable after passing of at least 14 hours without gunfire by the suspect given that the suspect threatened neighbors, forced them from their homes, engaged in a standoff with police, and threatened officers with weapons).

Plaintiffs have not established a basis for their "integral participant theory" of liability.  There is no evidence that Sergeant Nobriga or Corporal Silva formed a plan to shoot Hyer or

that they set in motion acts that they knew or should have known would cause an unconstitutional shooting of Hyer.  Peck, F.4th at 891-82.

Plaintiffs attempt to hold Sergeant Nobriga and Corporal Silva liable for a constitutional violation by relying on the Honolulu Police Department's internal guidelines.  Plaintiffs may not rely on a violation of the Honolulu Police Department's policies as a basis for Section 1983 liability when the use of force was objectively reasonable.  Cousins v. Lockyer, 568 F.3d 1063, 1070 (9th Cir. 2009) (explaining that the alleged failure to follow a policy by itself does not establish a federal constitutional violation); see Elifritz v. Fender, 460 F.Supp.3d 1088, 1112 (D. Or. May 13, 2020).

The use of deadly force by Corporal Torres was objectively reasonable based on the totality of the circumstances set forth in the undisputed facts.  Sergeant Nobriga and Corporal Silva cannot be liable for the use of deadly force as they were not integral participants in the use of such force.  The uses of force by Sergeant Nobriga and Corporal Silva were objectively reasonable.

Defendants Paul V. Nobriga, Wayne Silva, and Malo B. Torres' Motion for Summary Judgment (ECF No. 126) as to the excessive force claim is **GRANTED.**

The Court next turns to the Individual Officers' request for qualified immunity as to the excessive force claim.

## IV.  Qualified Immunity For The Use Of Force Claim

Qualified immunity attaches when an officer's conduct does not violate clearly established constitutional rights of which a reasonable person would have known.  Kisela v. Hughes, 138 S.Ct. 1148, 1152 (2018) (citing White v. Pauly, 137 S.Ct. 548, 551 (2017) (per curiam)).  Clearly established law exists when the contours of a right are sufficiently clear that every reasonable officer would have understood that what he is doing violates that right.  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

The determination whether a right was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition.  Pearson v. Callahan, 555 U.S. 223, 232 (2009).  The precedent establishing this right must place the question beyond debate.  al-Kidd, 563 U.S. at 741.  The inquiry is case specific but it is not so narrowly defined to preclude any potential claims without identical fact patterns. Kelly v. Borg, 60 F.3d 664, 667 (9th Cir. 1995).

Generally, courts follow a two-step inquiry in determining if a government official is entitled to qualified immunity.

First, a court must decide whether the facts that a plaintiff has demonstrated make out a violation of a constitutional right.  Pearson, 555 U.S. at 232.

Second, the court must decide if the right at issue was clearly established at the time of defendant's conduct.  Id.

The Court has already analyzed the Defendant Officers' use of force and found that the use of force was objectively reasonable under the totality of the circumstances.  Even if it was not objectively reasonable, Defendants Nobriga, Silva, and Torres are entitled to qualified immunity because it was not clearly established on June 23, 2018, that the officers' use of force was not authorized considering all the undisputed facts and the totality of the circumstances.

The United States Supreme Court recently explained that "specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  Kisela, 138 S.Ct. at 1152-54. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.  Id.

Plaintiffs have not pointed to any case that squarely governs the facts of this case to clearly establish that the officers' use of force was objectively unreasonable.  Plaintiffs again attempt to rely on the provocation theory in Billington v. Smith, 292 F.3d 1177, 1189 (9th Cir. 2002), which was specifically overruled by the United States Supreme Court in County of Los Angeles, Calif. v. Mendez, 581 U.S. 420, 428

64

(2017).

In the Fourth Amendment excessive force context, specificity is especially important.  Mullenix v. Luna, 577 U.S. 7, 12 (2015).  Police officers are entitled to qualified immunity in excessive force cases unless existing precedent squarely governs the specific facts at issue.  Ventura v. Rutledge, 978 F.3d 1088, 1090-92 (9th Cir. 2020) (citing Kisela, 138 S.Ct. at 1153).  Plaintiffs have failed to point to existing precedent that would have alerted the officers that their use of force was unlawful given the specific facts in this case.  Shafer v. Cnty of Santa Barbara, 868 F.3d 1110, 1118 (9th Cir. 2017) (holding that the officer was entitled to qualified immunity because plaintiff failed to identify sufficiently specific constitutional precedents to alert the officer that his conduct was unlawful).

There was no case as of June 23, 2018, that would have informed a reasonable officer that the conduct of the officers would violate the law.  To the contrary, at that time, it was clearly established that the use of deadly force was objectively reasonable when Corporal Torres reasonably perceived an imminent threat of harm by an armed suspect.  Long v. Cty. & Cnty. of Honolulu, 511 F.3d 901, 906 (9th Cir. 2007); Cruz, 765 F.3d at 1077-78; see Kisela, 138 S.Ct. at 1153.

Defendants Nobriga and Silva are also entitled to qualified immunity as there is no case to establish that their actions were unconstitutional.  See Hernandez v. Town of Gilbert, 989 F.3d

739, 746 (9th Cir. 2021); <u>Peck</u>, 51 F.4th at 891-92.

In sum, each Individual Officer is entitled to qualified immunity as Plaintiffs have not established any constitutional violation, let alone a clearly established one. <u>Kisela</u>, 138 S.Ct. at 1154-55; <u>Ventura</u>, 978 F.3d at 1092.

Defendants Paul V. Nobriga, Wayne Silva, and Malo B. Torres' Motion seeking qualified immunity is **GRANTED.**

## V.    Plaintiffs' Claim Against The City And County Of Honolulu Pursuant To Title II of the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq.

Title II of the Americans With Disabilities Act of 1990 ("ADA") prohibits a public entity from discriminating against any "qualified individual with a disability." <u>Sheehan v. City and Cnty. of San Francisco</u>, (<u>Sheehan I</u>), 743 F.3d 1211, 1231 (9th Cir. 2014) cert. granted sub nom., 135 S.Ct. 702 (2014), and rev'd in part, cert. dismissed in part sub nom. <u>City and Cnty. of San Francisco</u>, (<u>Sheehan II</u>), 135 S.Ct. 1765, 1778 (2015).

To state a claim pursuant to Title II of the ADA, a plaintiff must show:

(1)  he is an individual with a disability;

(2)  he was excluded from participation in or otherwise discriminated against with regard to the public entity's services, programs, or activities; and,

(3)  such exclusion or discrimination was by reason of his disability.

<u>Lovell v. Chandler</u>, 303 F.3d 1039, 1052 (9th Cir. 2002).

The Ninth Circuit Court of Appeals has determined that Title

II of the ADA applies to law enforcement investigations and arrests.  Sheehan I, 743 F.3d at 1232.

The alleged discrimination or failure to accommodate must be solely by reason of disability.  Lookabill v. City of Vancouver, 2015 WL 4623938, *8-*9 (W.D. Wash. Aug. 3, 2015) (citing; Weinreich v. Los Angeles Cnty. Metro. Transp. Auth., 114 F.3d 976, 978-79 (9th Cir. 1997)).

Here, Plaintiffs assert the Defendant City and County of Honolulu is liable for a violation of Title II of the Americans With Disabilities Act because they claim Hyer was discriminated against on account of his mental illness and that the police officers failed to accommodate him.

Even assuming that Hyer was a qualified individual with a disability, Plaintiffs have failed to show that officers here discriminated against Hyer or failed to accommodate Hyer solely because of his disability.  There is not a single piece of evidence to support Plaintiffs' theory.  See Bernardt v. Cnty. of Hawaii, Civ. No. 19-00209 DKW-KJM, 2021 WL 1936806, *8 (D. Haw. May 13, 2021) (granting summary judgment on plaintiffs' ADA claim where officers shot a suspect who pointed a crossbow at them where there was no evidence to show the availability of a reasonable accommodation or that one should have been used under the circumstances).

To the contrary, the undisputed facts demonstrate that Hyer posed a direct threat to officers and that the officers had

probable cause to arrest Hyer for crimes that included inherent risks for violence.  No claim pursuant to Title II of the ADA is available based on the undisputed facts of this case.  See Moore v. City of Berkeley, 2018 WL 1456628, *5 (N.D. Cal. Mar. 23, 2018); 28 C.F.R. §§ 35.104; 35.130(b)(7), 35.139 (explaining that a Title II ADA claim is not available when that individual poses a direct threat to the health or safety of others).

Defendant City and County of Honolulu's Motion for Summary Judgment (ECF No. 124) as to the Title II ADA claim is **GRANTED.**

## VI.  Remaining State Law Claims

Hawaii law provides that a nonjudicial government official has a qualified or conditional privilege with respect to tortious actions taken in the performance of a public duty.  Towse v. State of Hawaii, 647 P.2d 696, 702 (Haw. 1982).  Conditional privilege shields the government official from liability unless the plaintiff demonstrates by clear and convincing proof that the official was motivated by malice and not by an otherwise proper purpose.  Long v. Yomes, Civ. No. 11-00136 ACK-KSC, 2011 WL 4412847, *6 (D. Haw. Sept. 20, 2011).

"Malicious or improper purpose" is defined in "its ordinary and usual sense."  Awakuni v. Awana, 165 P.3d 1027, 1042 (Haw. 2007).  The Hawaii Supreme Court adopted the Black's Law Dictionary definitions of "maliciousness" and "malice" which provide the following meanings:

      (1)  substantially certain to cause injury and without just
cause or excuse;

      (2)  the intent, without justification or excuse, to commit
a wrongful act, reckless disregard of the law or of a
person's legal rights; and,

      (3)  ill will, wickedness of heart.

Id. at 1042-43.

Here, there is no clear and convincing evidence that the
Individual Defendant Officers acted with malice or an otherwise
improper purpose.  White v. Sabatino, 526 F.Supp.2d 1143, 1162
(D. Haw. 2007).  The undisputed facts demonstrate that the
individual officers were acting in the discharge of their duties
and are entitled to conditional privilege.  See Bernhardt, Civ.
No. 19-00209 DKW-KJM, 2021 WL 1936806, at *8 (granting
conditional privilege on the state law claims of wrongful death
and intentional infliction of emotional distress where plaintiff
produced no evidence, let alone clear and convincing evidence,
that an officer acted with malice when he shot a suspect who
threatened him with a crossbow).

Defendant Officers' Motion for Summary Judgment (ECF No.
126) as to the state law claims is **GRANTED**.  The officers are
entitled to conditional privilege.

Defendant City and County of Honolulu is likewise not liable
for Plaintiffs' state law claims under a theory of respondeat
superior liability as the Individual Defendant Police Officers
are entitled to conditional privilege.  See Reed v. Cty. & Cnty.
of Honolulu, 873 P.2d 98, 107 (Haw. 1994) (explaining that under

69

the doctrine of respondeat superior, if the employee is immune from suit, then the employer is also immune from suit and cannot be held liable).

Defendant City and County of Honolulu's Motion for Summary Judgment (ECF No. 124) as to the remaining state law claims is **GRANTED.**

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

## CONCLUSION

Defendants Paul V. Nobriga, Wayne Silva, and Malo B. Torres'
Motion (ECF No. 126) seeking qualified immunity is **GRANTED.**

Defendants Paul V. Nobriga, Wayne Silva, and Malo B. Torres'
Motion for Summary Judgment (ECF No. 126) is **GRANTED.**

Defendant City and County of Honolulu's Motion for Summary
Judgment (ECF No. 124) is **GRANTED.**

There are no remaining claims or Parties.

The Clerk of Court is **ORDERED** to **ENTER JUDGMENT** in favor of
Defendants and to **CLOSE THE CASE.**

IT IS SO ORDERED.

DATED: February 3, 2023, Honolulu, Hawaii.

Helen Gillmor
United States District Judge

Steven A. Hyer, Individually and as Personal Representative of
The Estate of Steven K. Hyer; Cassi H. Hyer; Theresa L. Chang v.
City and County of Honolulu; Paul V. Nobriga, in his individual
capacity; Wayne Silva, in his individual capacity; Malo B.
Torres, in his individual capacity; Civil No. 19-00586 HG-RT;
**ORDER GRANTING DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION FOR
SUMMARY JUDGMENT (ECF No. 124) and GRANTING DEFENDANTS PAUL V.
NOBRIGA, WAYNE SILVA, AND MALO B. TORRES' MOTION FOR QUALIFIED
IMMUNITY AND MOTION FOR SUMMARY JUDGMENT (ECF No. 126)**

71